**Royal M. LADNIER, Plaintiff-Appellant,**

**v.**

**Gary L. NORWOOD, D.V.M., et al., Defendants-Appellees.**

**No. 85–3193**
**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Jan. 30, 1986.

---

George M. Papale, Gretna, La., for plaintiff-appellant.

Richard S. Vale, Melanie J. Strigel, Metairie, La., for Norwood, Back-Stretch Surgery & Medicine, et al.

Before RUBIN, JOHNSON and JONES, Circuit Judges.

JOHNSON, Circuit Judge:

Plaintiff Royal M. Ladnier brought suit against defendants Dr. Gary L. Norwood, D.V.M., his insurer, Associated Indemnity Corporation, and Back-Stretch Surgery and Medicine, Inc. to recover damages for the death of Ladnier's thoroughbred racehorse, Flush Pilot. Ladnier alleged that Dr. Norwood was negligent in administering a drug known as Myosel-E to Flush Pilot. The trial was to the court without a jury; the court found for the defendants. After carefully reviewing the record, we affirm.

## I. BACKGROUND

Royal M. Ladnier, a resident of Mississippi, purchased Flush Pilot as a four and one-half month old stallion colt in 1979. Flush Pilot began racing in local racetracks near New Orleans in 1981 and was trained by Royal Ladnier's son, Randall Ladnier. During his racing career, Flush Pilot ran in seven races, winning two first place finishes and $12,030.00 in prize money.

While Flush Pilot was racing in the New Orleans area, he was treated by veterinarians at Back-Stretch Surgery and Medicine, Inc., a Louisiana corporation serving racehorse owners at various Louisiana tracks. Defendant Gary Norwood, an employee of Back-Stretch, practices veterinary medicine and specializes in treating racehorses.

Flush Pilot suffered from anhydrosis, a condition involving absence or insufficiency of sweat formation. As the district court noted, the disease primarily affects horses raised in cooler climates which are then moved to areas with hot humid climates. Although testimony in the record indicated that it affects as many as thirty percent of all racehorses in Louisiana during the summer, there is no known cure for the ailment. Its symptoms, however, may be alleviated by removing the horse from thermal stress. The district court noted that this could be accomplished by: (1) sending the horse to a cooler climate, (2) sending the horse to a farm for rest, (3) keeping fans or air conditioning in the horse's stable, or (4) exercising the horse only in early morning hours.

After it was discovered that Flush Pilot suffered from anhydrosis in June or July of 1982, Dr. Vincent A. Brencick, a colleague of Dr. Norwood's at Back-Stretch, discussed Flush Pilot's condition and the treatment options with the horse's trainer, Randall Ladnier. While Dr. Brencick was quite concerned for the horse's well-being, Dr. Brencick, noting the horse's good condition and strong racing performances, advised Randall that he felt the horse could be treated in Louisiana by keeping the horse cool, placing fans in his stable, supplying fluids, and training the horse early in the morning. Randall elected this course of treatment based on Dr. Brencick's advice.

On August 5, 1982, the day before he was to run in a race at Jefferson Downs, Flush Pilot was exercised but did not sweat. Randall found Norwood making his regular rounds and asked Norwood whether it would be helpful to give Flush Pilot a "jug." [1] Flush Pilot had received a similar jug on an earlier occasion, and Randall felt that it had eased Flush Pilot's anhydrotic condition. Dr. Norwood, who has done spe-

---

1. A "jug" is a fluid container which can be used to administer various fluids and nutrients which would relieve Flush Pilot's thermal stress.

cial research on anhydrosis in horses, agreed that a jug would be helpful and suggested adding a dose of Myosel-E to the solution.[2] Dr. Norwood's aim in adding Myosel-E was to add Vitamin E, which has been found helpful in veterinary research in treating anhydrotic horses.

As Dr. Norwood administered the jug to Flush Pilot, the horse began to stagger. Dr. Norwood stopped the solution. The horse fell down, and Dr. Norwood administered heart massage and adrenalin in an attempt to revive Flush Pilot. These efforts failed, and the horse died ten to fifteen minutes after the initial onset of the reaction.

The district court, 616 F.Supp. 940, concluded that Flush Pilot died from an anaphylactoid[3] reaction to the Vitamin E in the solution. The district court, however, concluded that Dr. Norwood was not negligent either in treating Flush Pilot with Vitamin E or in failing to warn the trainer of the possibility of a fatal reaction.

## II. THE MERITS

Plaintiff Ladnier contended at trial and argues on appeal (1) that Dr. Norwood was negligent in choosing to administer Myosel-E to Flush Pilot and in failing to advise Randall that sending the horse to a cooler climate was a safer alternative, and (2) that Dr. Norwood was negligent in failing to warn Randall of the possibility of a fatal reaction to Myosel-E. We deal with these contentions after a brief examination of Louisiana law.[4]

Louisiana courts have turned to medical malpractice cases in analyzing veterinary malpractice cases. In *Dyess v. Caraway*, 190 So.2d 666 (La.Ct.App.1966), the plaintiff sued Dr. Caraway for losses arising out of the death of the plaintiff's dogs. The court employed the standard then used in Louisiana medical malpractice cases and found that the evidence "disclosed that Dr. Caraway did exercise the degree of skill ordinarily employed under similar circumstances by the members of his own profession in good standing in his community." *Id.* at 668 (citing *Meyer v. Saint Paul-Mercury Indemnity Co.*, 225 La. 618, 73 So.2d 781 (1953)). The medical malpractice standard adopted in *Dyess* for veterinary malpractice cases has since been clarified in Louisiana statutory provisions. Under La.Rev.Stat.Ann. § 9:2794(A) (West Supp.1985), the plaintiff in a medical malpractice case currently is required to establish:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.

---

**2.** As the district court noted, Myosel-E is "an emulsion of selenium-tocopherol used for the prevention and treatment of myositis syndrome in horses." Defendant's Exhibit A. An emulsion is a mixture in which one liquid is dispersed throughout another in the form of minute droplets. "Tocopherol" refers to Vitamin E or a substance related to it. "Selenium," although toxic if administered in excess, makes the benefits of the Vitamin E more efficient and effective.

**3.** The district court noted the definition of "anaphylactoid":

Anaphylactoid refers to a condition which resembles the sensitivity, reactions, or other manifestations of anaphylaxis. Anaphylaxis

is the state of extreme sensitivity of a person or animal to the injection of a particular substance, usually a protein of another type of animal, or the actual reaction which follows such an injection. The severe reaction is generally brought on by a second or subsequent injection—not by the first. The first injection merely creates the condition of sensitivity for a subsequent injection. Anaphylactic means pertaining to the condition known as anaphylaxis.

Findings of Fact and Conclusions of Law n. 15.

**4.** The parties agree that Louisiana law applies to the instant case.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

See also Gurdin v. Dongieux, 468 So.2d 1241, 1245–46 (La.Ct.App.1985).[5] Accordingly, the district court in the instant case appropriately cited and employed La.Rev. Stat.Ann. § 9:2794(A)(1) (West Supp.1985) in holding that "defendants Dr. Norwood and Back-Stretch should be held, like physicians, to the standard of care expected of practitioners in their specialty, namely, equine medicine." Conclusion of Law No. 8. Based on the testimony of the expert witness in the case, Dr. Jill McClure, and the other evidence presented at trial, the district court concluded that Dr. Norwood had met this standard and was not negligent in administering Vitamin E to Flush Pilot.[6]

■ Nor can it be said that the district court's finding that Dr. Norwood was not negligent is clearly erroneous. See Fed.R. Civ.P. 52(a); Cable v. Cazayou, 351 So.2d 797, 799 (La.Ct.App.1977) (physician's negligence is question of fact not to be disturbed unless "manifestly erroneous"). The Supreme Court of the United States has recently stated, "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, — U.S. —, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). This Court's review of the record demonstrates that the district court's assessment that Dr. Norwood was not negligent is more than a permissible view of the evidence. The district court found that, based on the advice of Dr. Brencick, Randall Ladnier elected to continue to race Flush Pilot while relieving thermal stress on the horse through fans, early morning exercises, and increases in fluid intake. The record demonstrates that this was a standard practice of equine specialists in relieving anhydrosis symptoms. The district court noted that the research literature in veterinary medicine supported the use of Vitamin E to supplement these treatments. Further, while the manufacturer of Myosel-E does not recommend the product specifically for anhydrosis, the medication is recommended for horses, and the district court noted that the expert witness, Dr. McClure, testified that Dr. Norwood properly used Myosel-E as a source of injectable Vitamin E. Further, the district court noted the unrefuted testimony that anaphylactic reactions from Myosel-E are extremely rare and occur only once in every 25,000 dosages of the drug. Given these findings, which are clearly supported by the record, it cannot be said that the district court clearly erred in concluding that "the plaintiff ... failed to carry his burden of proving by a preponderance of the evidence that the defendants were negligent." Conclusion of Law No. 12.

■ Plaintiff's second contention is that the district court erred in finding that Dr. Norwood had no duty to warn Flush Pilot's trainer of the possibility of a fatal reaction to Myosel-E. Plaintiff relies on Louisiana's

---

**5.** In Ardoin v. Hartford Accident and Indemnity Co., 360 So.2d 1331 (La.1978), the Louisiana Supreme Court noted that the statute abolished the "community" or "local" rule as a basis of establishing the degree of care ordinarily practiced by specialists.

**6.** The plaintiff's contention that the district court applied an incorrect legal standard is patently without merit. Based on statements drawn from the context of Dr. McClure's testimony, the plaintiff Ladnier asserts that the district court should have applied a legal standard which required Dr. Norwood to use only the treatment with the greatest proven clinical efficacy and the least possible risk. While this suggested degree of care may well be appropriate in treating human patients, Dr. McClure unequivocally testified that Dr. Norwood's action in treating the horse with Vitamin E to supplement the other treatments was a recognized approach fully in accord with the standards of equine veterinary practices.

Uniform Consent Law, La.Rev.Stat.Ann. § 40:1299.40 (West 1977), which defines consent to medical treatment in the context of human patients.[7] While we express some doubt as to whether the statute should be applied by analogy to the veterinary context,[8] it is clear under the district court's findings that defendant Norwood breached no duty to warn which caused Flush Pilot's death. The testimony unequivocally established that equine specialists do not consider the risk of an anaphylactic reaction substantial enough to warrant a warning. Further, Dr. McClure estimated the chance of such a reaction as one in 25,000 dosages. Moreover, the record established that Flush Pilot had previously received numerous drugs with a similar potential and that nearly all drugs used in equine medicine carried a similarly remote chance of a fatal reaction. Given this evidence in the record, which the district court credited, Dr. Norwood did not breach his duty to warn under Louisiana jurisprudence, nor can it be said that Dr. Norwood's failure to warn caused Flush Pilot's death under the Louisiana Uniform Consent Law. *See LaCaze v. Collier*, 434 So.2d 1039, 1048 (La.1983).

Accordingly, the judgment of the district court in favor of the defendants is

AFFIRMED.

---

7. The statute provides:

§ 1299.40 *Consent to Medical Treatment*

A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure ... which (a) sets forth in general terms the ... known risks, if any, of death, ..., (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances....

. . . . .

C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.

8. Plaintiff cites little support for his contention that the statute should be applied in the veterinary context, other than that it is "logical and fair to do so." Plaintiff's Brief at 22. As Louisiana's courts have noted, however, the basis of the consent statute may be traced to the tort of battery. *See Karl J. Pizzalotto, M.D., Ltd. v. Wilson*, 437 So.2d 859 (La.1983). Therefore, it seems equally "logical" that the statute should be applied only to human patients. This Court's resolution of the instant case, however, removes the necessity of reaching this question.