520 So.2d 383 (1988)
Marvin CARTER
v.
LOUISIANA STATE UNIVERSITY, et al.
No. 87-C-1766.
Supreme Court of Louisiana.
February 29, 1988.
Rehearing Denied March 31, 1988.
*384 Bert Dexter Ryland, Garrett, Ryland & Nunnally, Rhett R. Ryland, Alexandria, for applicant.
Dorothy Thomas, Breazeale, Sachse & Wilson, Baton Rouge, for respondents.
WATSON, Justice.
In this suit alleging that veterinary malpractice resulted in the amputation of a horse's tail, the issue is whether the trial court was clearly wrong in holding the veterinarian liable.

FACTS
Plaintiff, Marvin "Frances" Carter, is the owner of a registered quarter horse, "Moonlite Danny", which was taken to the L.S. U. School of Veterinary Medicine. Because the horse was suffering from diarrhea, his tail was washed and covered with a plastic protective sleeve which was bound with a strip of adhesive tape. An ulcer appeared on the ventral or underside of the tail about two inches from the base of the tail at the approximate location of the adhesive tape. Because of spreading gangrene, the tail had to be surgically removed.
The trial court concluded that a student had been negligent in wrapping the tail too tightly and this necessitated the amputation. The attending veterinarian, Dr. Ralph Beadle, and Fireman's Fund Insurance Company,[1] were cast for $34,000 in damages on the basis of the horse's diminished value and loss of stud fees between 1983 and 1986.
The court of appeal reversed, finding manifest error in the holding that plaintiff proved by a preponderance of the evidence that a student wrapped the horse's tail too tightly.[2] A writ was granted to review the judgment.[3]
Plaintiff Carter testified that he acquired "Moonlite Danny" for breeding purposes on July 7, 1981, at a price of $7,500. The horse was approximately ten years old and could have been bred for ten to fifteen years. After insuring the horse for $10,000, Carter bred him to twenty-seven outside mares and three or four of his own. The charge in 1982 was $350 per live foal, which Carter described as an introductory price. In 1982, the horse earned $9,475 in stud fees.
Around September 10, 1982, Danny was having intermittent colic, i.e., stomach problems, and was treated by Dr. Neal Reeder at the Cenla Animal Clinic in Pineville. After the medication prescribed for the horse resulted in scouring or diarrhea, Dr. Reeder suggested transfer to the L.S. U. Veterinary School.
On September 17, 1982, a Friday, Carter took the horse to Baton Rouge. At the veterinary center, he furnished information for a health form on the horse. A student assisted in unloading him, and Carter talked briefly to Dr. Beadle. On Saturday morning, the horse's internal organs were palpated. On the following Monday, Dr. Beadle called Carter and said he thought the horse had a salmonella infection and *385 they were running tests. A few days later, Dr. Beadle called and said they had located the stomach problem, but the tail was infected and might have to be amputated. According to Carter, Dr. Beadle said that possibly a student had wrapped the tail too tightly resulting in gangrene. Later, Carter was advised that the tail had been amputated and the horse could be picked up in two or three days. According to Carter's testimony, the tail area was still bleeding when the horse was discharged. Carter paid a bill for $628.42. Dr. Beadle said the total charge was approximately $1,800.
Carter described several ill effects from the loss of the tail: The horse's looks were ruined, a large part of his appeal, because Carter was selling conformation[4] as well as breeding. In addition, the stallion's disposition changed, and he commenced kicking the sides of his stall. A tail helps a horse keep clean and fight insects. Insects are now a problem and the horse urinates in his stall and then rolls in the urine. Since he stays dirty, he has to be bathed fairly often and the horse has worn out two or three $35 blankets, each in a couple of weeks. The horse did not receive many breedings, and most of the people who came just wanted to see a bob-tail horse because it is a rarity. A bug light is another additional cost.
In 1983, Danny earned $3,250, although the price was increased to $750 for new mares. Most of the 1983 breedings, thirteen out of seventeen, were return breedings. In 1984, Danny bred five mares, which had not conceived the previous year, and one new mare. No money was involved; Carter traded one breeding for another. In 1985 only four or five mares were bred to Danny, even though the fee had been reduced back to $350. In 1986, Danny bred only one mare. In addition to the additional care and loss of stud fees, Carter is embarrassed by the appearance of his horse. He intends to sell the animal and buy another stallion because the conformation of the horse is ruined by the absence of a tail. The remaining tail area is insufficient for attachment of a prosthetic device. Carter has unsuccessfully attempted to market the horse for $2,000.
A 1982 advertisement represented that "Moonlite Danny" was the:
"... [S]ire of 3 ROM Qualifiers out of 6 starters (50%) (All Winners) including: Moonlite Cue Boy (si101-$13,040)Moonlite Adventure (si78-$4,860) Live Entertainment (si80-$2,225).
* * * * * *
"Introductory Fee $350-live foal."[5]
This advertisement was mailed to the 1,100 members of the Louisiana Quarter Horse Association in 1982 but not in 1983 or subsequent years. Carter felt the photograph on the brochure constituted false advertising, because it showed Danny with a tail. In addition to the winners named in the brochure, Danny had a colt, Northern Force, which won $20,000.
Although the stallion is still able to breed, he is no longer able to pump his tail or "flag" when he ejaculates to indicate that the mare has been bred.
Dr. Ralph Beadle, a professor of veterinary medicine, treats animals and also teaches. The history on "Moonlite Danny" was taken by student Bruce Baker. Baker was working under the supervision and direction of Dr. Beadle who admitted ultimate responsibility for the treatment. Bruce Baker also did the first physical examination of the horse. He was rotated and student Gayle Harris was then assigned to Danny.[6]
"Moonlite Danny" was admitted with diarrhea. A protective sleeve was placed on the tail either on Friday (the 17th) or Saturday (the 18th) by student Baker. The sleeve prevents soiling of the tail and protects people handling and examining the *386 animal. A small lesion later appeared on the ventral side of the tail. After the lesion was noticed, it was treated with an antibiotic cream, and another sleeve was placed on the tail; Dr. Beadle did not see the lesion when it was first noticed. When Dr. Beadle first observed the ulcer on September 22, it was approximately a centimeter in diameter. Dr. Beadle admitted that the lesion was two or three inches from the base of the tail in the approximate area where the tape was secured. The September 22 medical record notes an: "Ulcerated area on ventral side of tail." Although Dr. Beadle testified that the ulceration never covered the entire circumference of the tail and was worse on one side than the other, the horse's medical records note a severe laceration around the circumference of the tail on September 23. Dr. Beadle admitted that an ulceration around the circumference of the tail would indicate that the tape had been put on too tightly. Dr. Beadle also admitted he told Carter that wrapping the tail too tightly was one possible cause of the amputation.
On September 23, 1982, the horse's records noted: "loss of sensation [in the ulcerated area] and no immediate bleeding from needle prick. Gangrene is probably setting in on the wound...." On September 26, the tail was granulating above the gangrenous area and hair was falling out below. The tail was amputated on September 27, 1982.
The operative report of Dr. Bill Lindsay,[7] who amputated the tail, diagnosed "septic avascular necrosis of tail." In other words, the tail had infected (septic) dead tissue (necrosis) due to a deficient blood supply (avascular). Avascular necrosis is the medical term used to describe a condition in which tissue has died because the blood supply has been cut off. The surgical report says that a circumferential incision was made around the tail to remove all necrotic and devitalized tissue down to the bone. Dr. Beadle served as anesthetist at the surgery.
Dr. Beadle admitted that the problem with the tail could have been caused by a student wrapping the sleeve too tightly at the base of the tail. He preferred to call the resulting condition infection rather than gangrene. Although the infection did not respond to treatment and gangrene does not respond to treatment, the only infection found was proteus, which is a common bacteria in horse feces. Dr. Beadle insisted that the skin around the circumference of the tail did not ever completely die indicating an infection rather than constriction and the statements in the medical records were inaccurate assessments by students. The notation on September 23 that the tail had a severe ulceration around its circumference was a characterization that Dr. Beadle disagreed with but never corrected. However, he did testify at one point that the ulceration "spread around the tail."[8] Dr. Beadle admitted that tight tape around the tail could interrupt the blood supply and cause necrosis of the tail below that point. In Dr. Beadle's opinion, the problem with the tail could have resulted from too tight wrapping, a proteus organism, or an allergic reaction to the tape, although he considered the allergic reaction a minor hindsight possibility. At the time, a proteus infection or too tight wrapping were the only things he considered. He admitted a proteus organism causing infection in a horse's tail to the extent that the tail would be lost would be very rare as would an allergic reaction. Dr. Beadle had never heard of a proteus organism causing the amputation of a horse's tail, but he had heard of a horse's tail sloughing when the blood supply was interrupted.
Dr. Charles C. Kleinpeter, a specialist in equine medicine and surgery, testified as an expert that the treatment of "Moonlite Danny" was above the normally accepted standard of care in the community. If the tail had been wrapped too tightly, he would not regard that as a violation of the standard of care but a normal risk of this common procedure. In his opinion, "Moonlite *387 Danny" might have had another ten years of productive life when he was purchased, although some horses are virile into their twenties. Dr. Kleinpeter had observed one tail which had been wrapped too tightly resulting in amputation of the tail. In that case, there was ulceration around the circumference of the tail. According to Dr. Kleinpeter, it is difficult to wrap a tail too tightly, and it is not common. In his experience the proteus organism is an opportunist type of organism which can cause complications in a pre-existing lesion and can cause a primary lesion if there has been a predisposing problem making the skin susceptible to infection. In his experience, the students' records are graded and discussed by the teaching doctors and the students know that their comments will be evaluated.
Donald C. Stemmans testified that "Moonlite Danny" has grown some hair on the stump of his tail and that he is a good looking horse whose absence of a tail should not affect his breeding potential. Because of a decline in the economy of the horse business, there are fewer mares available for breeding and the stallion's value has probably decreased to $3,500 or $4,000.

LAW
Few Louisiana cases have considered the question of veterinary malpractice. In Ladnier v. Norwood, 781 F.2d 490 (5 Cir. 1986) a horse died from a fatal reaction to a vitamin E solution. Since the chances of that reaction were estimated at one in twenty-five thousand, the trial court concluded that there was no failure to warn of that possible consequence and dismissed plaintiff's suit. In affirming, the federal court of appeal noted that the fact finder is entitled to choose between two permissible views of the evidence.
Dyess v. Carraway, 190 So.2d 666 (La. App. 2 Cir.1966) applied a medical malpractice standard to veterinarians. Dyess sued to recover for the death of five pedigreed Norwegian Elkhound puppies and the Second Circuit concluded that there was no unusual occurrence raising an inference of negligence.
Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953), a medical malpractice case, involved oral surgery in which a tooth was knocked loose by a laryngoscope and projected into the plaintiff's right lung where it was immediately removed by a bronchoscope. Under Meyer, when an unusual and unexpected occurrence results from medical treatment, the professional person responsible must show that the consequence did not result from his or her negligence.[9]
In some malpractice cases, expert testimony to establish a standard of care is unnecessary because lay persons can infer negligence from the circumstances. Hastings v. Baton Rouge Gen. Hosp., 498 So. 2d 713 (La.1986).
When a rare event occurs under medical supervision, and the circumstances are within the knowledge of defendants but not plaintiff, an inference of negligence is justified. McCann v. Baton Rouge General Hospital, 276 So.2d 259 (La.1973).
When the circumstances surrounding an unusual occurrence indicate there was an omission of duty by a defendant in control, an inference of negligence arises under the doctrine of res ipsa loquitur. LSA-R.S. 9:2794;[10]White v. McCool, 395 So.2d 774 (La.1981).
The locality standard of care is inapplicable to a veterinary specialist. See Ardoin *388 v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978).
LSA-C.C. art. 2316 says:
"Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."
LSA-C.C. art. 2320 provides in pertinent part:
"* * * Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.
"In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it."

CONCLUSION
This case is apparently sui generis, the only malpractice claim for a bob-tailed horse reported in the country. Loss of a horse's tail as the result of veterinary treatment appears to be a rarity. This was confirmed by the testimony of the two expert witnesses, Drs. Beadle and Kleinpeter. They knew of only one other horse which had lost its tail. This other bob-tailed horse had its tail wrapped too tightly, plaintiff's contention here.
Since a horse being treated for a stomach disorder does not lose his tail under ordinary circumstances, an inference of negligence on the part of those entrusted with his care arises. Meyer, White and McCann, supra. There is no question that Dr. Beadle is responsible for the students whose work he directed and supervised. LSA-C.C. art. 2320. Dr. Beadle is an expert in his field who is required to meet more than a community standard of care. Ardoin, supra. Danny was referred to Beadle because of his expertise.
Dr. Beadle is, of course, a defendant in the suit and an interested party. The trial court was required to weigh his credibility against that of plaintiff, Marvin Carter. According to Marvin Carter, Dr. Beadle told him the amputation was possibly necessitated by the horse's tail being wrapped too tightly. A credibility issue must be assessed by the trier of fact who has the benefit of judging the witnesses' demeanor and comportment as well as their words.
Supporting the testimony of Marvin Carter is the medical record kept by Dr. Beadle's students, who actually attended the horse. These records indicate that what occurred was caused by over tight wrapping of the tail. Since Dr. Beadle did not question the student's records contemporaneously, he was not in a good position to do so at trial.
The necessary amputation of a horse's tail is an unusual occurrence rarely encountered. Although expert Dr. Kleinpeter testified that wrapping the tail too tightly would not be below the standard of care in the community, he also admitted that he knew of only one other case in which that had occurred. Meyer and Hastings, supra. Since Dr. Kleinpeter admitted it was actually "difficult" to wrap a tail too tightly, this was not a normal or expected risk of treatment. Neither he nor Beadle knew of a tail being amputated for any other reason. Hastings and McCann, supra.
After entrusting "Moonlite Danny" to the Louisiana State University Veterinary School and Clinic for treatment of a stomach complaint, plaintiff Carter was later presented with a tailless horse. It is impossible for Marvin Carter to know what happened to his horse while it was in the care of Dr. Beadle. The treating veterinarian, Dr. Beadle, did not account for the unusual and unexpected result. McCann, supra.
Unexplained by Dr. Beadle is why he did not look at the initial lesion and why the tail was rewrapped after he observed a one centimeter ulceration which later spread around the circumference of the tail. Three days later, the tail was granulating above the gangrenous area and the hair was falling out below that site. The medical records completely support the "possibility" admitted by Dr. Beadle, too tight wrapping of the tail. LSA-C.C. art. 2320.
*389 The most persuasive evidence is the operative report made for Dr. Lindsay, who performed the amputation. The operating report was completely overlooked by the court of appeal and establishes that the tissue in the tail died when the blood supply was cut off.
The evidence that "Moonlite Danny" had his tail wrapped too tightly, resulting in avascular necrosis from loss of blood supply, gangrene, and amputation is persuasive. The report for the surgeon who removed the tail is sufficient alone to support plaintiff's case. The trial court was clearly right, and the court of appeal erred in substituting its judgment of credibility and weight of evidence.
Dr. Beadle did not exculpate himself from responsibility for this unusual event.

DAMAGES
Despite the testimony that the horse remained functional, there is no question that his owner sustained substantial damages, including the embarrassment of owning a tailless stallion. His testimony that the horse's disposition and habits had changed, making him more difficult to handle, was uncontradicted. The record supports the trial judge's conclusion that the horse had a loss in value of $4,000. Using the amount earned as stud fees in 1982, which was $9,475, the trial court awarded a total of $30,000 for the years 1983, 1984, 1985 and one half of 1986. No award was made for future losses, but it appears that plaintiff has been amply compensated. Since the damages are well within the "much discretion" accorded the trier of fact, no purpose would be served by a remand to the court of appeal.[11] LSA-C.C. art. 1999; cf. LSA-C.C. art. 1934(3) (1870). There is no abuse of discretion in the damages fixed by the trial court, particularly difficult in this unusual case.

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed and the trial court judgment is reinstated.
REVERSED; TRIAL COURT JUDGMENT REINSTATED.
LEMMON, J., concurs.
NOTES
[1] Prior to trial, the American Veterinary Medical Association Professional Liability Insurance Trust, Louisiana State University and Dr. Donald R. Lingard were dismissed as defendants.
[2] 513 So.2d 560 (La.App. 1 Cir.1987) [unpublished opinion].
[3] 513 So.2d 1195 (La.1987).
[4] For a full discussion of the importance of conformation or physical appearance in race horses (there thoroughbreds instead of quarter horses), see the excellent opinion by Cutrer, J., in LeBlanc v. Underwriters at Lloyds, London, 402 So.2d 292 (La.App. 3 Cir.1981).
[5] P-15.
[6] Baker moved to Missouri, and Harris is in Mississippi.
[7] Dr. Lindsay now resides in Madison, Wisconsin.
[8] Tr. 120.
[9] Meyer was overruled by Ardoin, infra, insofar as Meyer applied a locality test to medical specialists.
[10] LSA-R.S. 9:2794 provides in pertinent part:

"C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician, dentist or chiropractic physician. The jury shall be further instructed that injury alone does not raise a presumption of the physician's, dentist's or chiropractic physician's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable."
[11] Under this disposition, the question of whether the issue of reduction in damages is before the court, as discussed during oral argument, is pretermitted.