Mike and Jane MORELAND

v.

D.M. LOWDERMILK et al.

Civ. A. No. 87–2249.

United States District Court,
W.D. Louisiana,
Shreveport Division.

March 9, 1989.

Sam Ned Gregorio, Shreveport, La., for plaintiffs.

Brian D. Smith, Lunn, Irion, Johnson, Salley & Carlisle, Shreveport, La., for defendants.

## MEMORANDUM OPINION

STAGG, Chief Judge.

This case is about a fine young, female, equine athlete whose untimely demise is sought to be laid at the door of her attending veterinarian. Her owners seek monetary damages based on her potential earnings on the race track and as a brood mare of a future generation of purse winners. After many years of hearing and deciding cases involving sick people and their doctors, this is this court's first veterinary malpractice case. It is brought by Mike and Jane Moreland, who raised Sandhill Diamond from a colt and, as a two- and three-year-old filly, moved her from track to track on the racing circuit.

Named as defendants are the three veterinarians who allegedly treated Sandhill Diamond, D.M. Lowdermilk, D.M. Cooley and R.A. Burgess [1] and their liability insurer, Associated Indemnity Corp. The defendants have asserted a counterclaim seeking to recover monies owed for veterinary services provided. A bench trial was held on February 23–24, 1989. After hearing six live witnesses, reading the depositions and exhibits filed in evidence and reviewing my trial notes, I conclude (1) that the plaintiffs have not carried their burden of proving that Dr. Lowdermilk's services were the cause of the loss of Sandhill Diamond and (2) that the plaintiffs owe for the services rendered by him.

## FINDINGS OF FACT

Vagabond Nell gave birth to Sandhill Diamond on April 6, 1983, on the plaintiffs' farm in Imperial, Nebraska. Sandhill Diamond entered the racing circuit in 1985. Her trainer was Linda Davidson, Jane Moreland's sister. Though not of a partic-

---

**1.** Upon joint motion made during trial, the action against Dr. Burgess was dismissed with prejudice.

ularly strong pedigree, Sandhill Diamond, over her racing career, earned a racing index of 4.9 which placed her in the top 10 per cent of thoroughbred winners in the country. At the time of her untimely death on October 13, 1986, Sandhill Diamond was the leading Nebraska filly and had career race winnings in excess of $100,000.

Late in the afternoon on Sunday, October 5, 1986, Sandhill Diamond ran what was to be her last race at Louisiana Downs in Bossier City, Louisiana. In that race she finished third or, more commonly, "showed". According to Linda Davidson, the horse drank only five gulps of water after the race. Davidson also testified that on October 5,[2] the mare did not eat her evening feed and she was unsure whether the horse had eaten any hay.

According to Davidson, Sandhill Diamond ate neither feed nor hay on October 6. Davidson advised Dr. Lowdermilk on that date that she had a mare who had not eaten her night feed. Dr. Lowdermilk responded that it was probably due to post-race stress.

Davidson became concerned on October 7 because she believed the horse still had neither eaten nor drunk anything. Her belief that Sandhill Diamond had not drunk water was based on a periodic check of the water bucket in the horse's stall. Davidson admitted that she was not with the horse around the clock. According to Davidson, however, no one else would be allowed in that stall. It was not disputed, however, that others had access to the area and could have added water to the bucket without Davidson's knowledge. On the other hand, Dr. Lowdermilk was under the impression that the horse had been drinking some. He also testified that he understood the mare was drinking two to three gallons of water per day after October 7.

The court is unpersuaded, either by testimony of Dr. Lowdermilk or Linda Davidson, regarding the amount of the horse's water intake. The evidence on this point is inconclusive as neither Dr. Lowdermilk nor Davidson spent enough time with the mare to testify convincingly regarding

how much water she drank. Though either Dr. Lowdermilk or another doctor from his office checked on the horse two to three times a day, beginning on October 7, the visits were normally brief. Davidson spent several hours around the stall but admitted that she would go elsewhere on the race track and, from noon to 6:00 P.M., would not be at the track.

Dr. Lowdermilk examined the horse on October 7, 1986, and strongly suspected that Sandhill Diamond suffered from thromboembolic colic. "Colic" refers to any abdominal pain. "Thromboembolic colic" is the type of abdominal disease that is reserved to situations where there is a vascular compromise to the bowel. "Thrombi" are organized clots attached to the walls of the blood vessels, such as the cranial mesenteric artery. These thrombi become dislodged, function as emboli, and block other blood vessels that include arterial supply to certain segments of the bowel.

The damage resulting from thromboembolic colic is due primarily to migrating strongylus vulgaris larvae—more commonly referred to as blood worms. As this parasite goes through its migration stages, it usually nests in the cranial mesenteric artery that supplies blood to the large intestines and the cecum. Though these larvae initially locate in the cranial mesenteric artery, they migrate in to the wall of that artery and eventually make it back to the bowel. They then penetrate into the lumen of the bowel, where they mature as adults and begin producing eggs that pass with the feces. The life cycle from the time of infestation of larvae until the time they become mature adults producing eggs is approximately six months. Some of the eggs emerge in the feces and into the grass. It is through grazing in an infested area that horses normally ingest the parasite.

On October 7, Sandhill Diamond's vital signs appeared normal, but her gut sounds were slightly weak. A fecal exam performed on that day was positive for blood worms. Dr. Lowderdermilk gave the horse

2. Unless otherwise stated, all dates referred to in this opinion are in October of 1986.

Banamine and d-Panthenol. Banamine is a nonsteroidal anti-inflammatory drug that was given for pain. D–Panthenol is an intestinal stimulant. This was given because Sandhill Diamond had not passed feces since the race. In addition to Banamine and d-Panthenol, Dr. Lowdermilk gave the horse an analgesic for pain. Also on October 7, Dr. Lowdermilk gave Sandhill Diamond one gallon of mineral oil through a nasogastric tube. Electrolytes were administered intravenously. (*See*, Plaintiffs' Exhibits 7 and 16.)

On October 8, Dr. Lowdermilk administered the same drugs that he had given on October 7 but did so in the morning, afternoon and evening. A blood sample was taken for a complete blood count (hereinafter "CBC"). The CBC contained a reading for the packed cell volume which is an indication of whether the horse is dehydrated. Once again, mineral oil was given through the nasogastric tube, and other fluids were given intravenously. Though Sandhill Diamond, as she had on the 7th, showed signs of discomfort, her vital signs and CBC were normal.

On October 9, Dr. Lowdermilk repeated the medication—but only once during the day. The mare showed signs of improvement as oil came through. The horse also passed, for the first time since October 5, a few fecal balls. According to the testimony of Dr. Alicia Bertone,[3] an expert in equine veterinary medicine, this was a positive indication that intestinal movement had begun again. Even Davidson testified that the horse seemed to improve on the 9th.

On October 10, Dr. Lowdermilk administered the same medications that he had on the three previous days. Sandhill Diamond had, on that day, a swollen knee and a small puncture. Dr. Lowdermilk treated the swollen knee by giving the horse some antibiotics and Naquasone. Naquasone is a steroid diuretic and an anti-inflammatory drug used in the treatment of trauma and swellings. It will also draw fluid from abnormal compartments in the body. Sandhill Diamond passed more manure on the 10th and showed minimal signs of improvement. Her gut sounds were better, though still not quite normal.

Sandhill Diamond's condition began to decline rapidly on October 11. She developed a fever and, for the first time, showed clinical signs of dehydration. Dr. Lowdermilk administered an antibiotic in an effort to reduce the temperature. Bute, Banamine and d-Panthenol were also administered on that morning. By evening, the horse showed signs of shock.

In an effort to treat the shock, Dr. Lowdermilk gave the horse SoluDelta Cortef with electrolytes. The morning medication was repeated and a gallon of mineral oil was given between 8:00 and 10:00 P.M. Dr. Lowdermilk advised Davidson that the horse "was not going to make it," and that she had basically two choices: euthanasia or watch the horse suffer and die. Distraught with these alternatives, Davidson insisted there must be another choice. Dr. Lowdermilk then said that he would give the horse a rectal exam, and, if Sandhill Diamond was not torn inside, he would administer more antibiotics and hope for the best. The exam was conducted and additional antibiotics were given.

Both Dr. Lowdermilk and Davidson left the horse at about 10:00 P.M. Davidson returned at 11:00 P.M. She telephoned Dr. Lowdermilk and told him that Sandhill Diamond's legs were cold and that the mare was in pain. Dr. Lowdermilk stated that he would come out to the race track and put the horse to sleep. Dissatisfied with this response, Davidson telephoned her sister and brother-in-law. The Morelands advised her to try to find someone else,

---

3. Dr. Bertone teaches at the Louisiana State University School of Veterinary Medicine. Her major area of interest in research is studying the morphology of horse intestines. She is board certified in surgery and her Ph.D. dissertation was entitled: "Equine Intestinal Function and Adaptation to Extensive Large Colon Resection." She teaches "Large Intestinal Diseases of Horses" and has conducted labs regarding equine colic examinations. Her abundance of knowledge concerning intestinal diseases in horses is apparent not only from her impressive curriculum vitae but also from her testimony.

whereupon Davidson contacted Dr. R.J. Wolfe.

Dr. Wolfe arrived at the race track at 1:30 A.M. on October 12. According to Dr. Wolfe, the mare was clinically in shock. The horse's gut sounds were depressed and abnormal. He believed that the filly was colicked and probably had peritonitis. Peritonitis is the infection or inflammation of the peritoneum, the surface that lines the entire abdominal area covering all of the intestinal tract. When heavily colonized by bacteria, the peritoneum turns into a body cavity that is akin to a very large abscess.

Dr. Wolfe ran two diagnostic tests—a hemotocrit and a total protein count—both of which indicated the horse was dehydrated. Dr. Wolfe administered fluid therapy of 20 liters and gave the horse Banamine, Dyprone, Gentocin, which is an antibiotic, and Heparin, an anticoagulant. The Dyprone was given to lower the horse's temperature, stabilize gut motility and reduce pain.

Dr. Wolfe felt the mare needed to get to a hospital and a veterinarian who specialized in abdominal surgery. Toward this end, the mare was transferred to Dr. Robert D. Lewis in Elgin, Texas. Sandhill Diamond arrived at Dr. Lewis' clinic around noon on October 12. At that time, the mare had blue mucus membranes, a clinical indication of shock, and an abnormal heart rate. Dr. Lewis performed an abdominocentesis, or more commonly referred to as an abdominal tap, which documented an ongoing and extensive septic peritonitis. An intravenous catheter was installed in the mare and four gallons of intravenous saline were administered at a high rate to try to get the horse's blood pressure back up. A Foley's catheter was placed in the mare's abdominal cavity to drain the peritoneal fluids. Later, prior to surgery, an additional ten gallons of fluids were administered.

Dr. Lewis telephoned the Morelands and advised them that Sandhill Diamond's symptoms were strongly suggestive of thromboembolic colic, to which the peritonitis was secondary. He stated that the peritonitis was grave enough to kill the horse.

He felt that he could not provide more conclusive information without performing an exploratory laparotomy. Dr. Lewis advised the Morelands that Sandhill Diamond, in his opinion, was a poor candidate for surgery. Because the Morelands did not want to leave any stones unturned, the surgery was requested and performed.

The exploratory surgery revealed rampant peritonitis which resulted from a classic case of a thromboembolic disease. Dr. Lewis also found evidence of gangrene which affected areas throughout the entire large colon. The most affected region in the large colon was the pelvic flexure area which is the most distal extremity of the loop of the large colon that is the farthest from the main arterial supply. This area was gangrenous and near the point of rupture.

On page 45 of his deposition, Dr. Lewis described the bowel as normally pink and healthy looking: "Then you will have a black spot, and you have these all over splotched, and it's kind of like a Dalmation (sic) dog appearance to the colon." Dr. Lewis examined the horse's cranial mesenteric artery which he found to be abnormally large for a three-year-old mare. Since the strongylus vulgaris larvae migrate through this artery, Dr. Lewis concluded that the enlarged artery was consistent with his diagnosis of thromboembolic colic. Between 60 and 70 per cent of the large colon was removed in the operation.

Sandhill Diamond died about 1:00 P.M. on October 13. Dr. Lewis's opinion was that the horse died due to overwhelming septic shock that resulted in cardiac failure. Septic shock, according to Dr. Lewis, is an abnormal exposure of the circulatory system to bacteria and their toxins. The shock results in hemoconcentration, and a a drop in blood pressure due to the effect of the toxins on the vascular system.

The septic shock, in Dr. Lewis's opinion, was triggered originally by a thromboembolic episode, or shower of emboli, that was due to significant cranial mesenteric artery disease. The artery disease was caused by the migration of strongylus vulgaris larvae —bloodworms burrowing into artery walls

creating thrombi. These thrombi become dislodged most commonly during transport or an athletic event. Regarding whether the mare's chances would have been improved had Dr. Lewis received her earlier, he testified: "I don't know if I could have —this mare had enough disease that if I had gotten her earlier in the case, I got a strong suspicion the outcome inevitably may have been the same because she had a severe case of it, but I don't know that, you know." [4]

## ANALYSIS OF LAW AND FACTS

Plaintiffs contend that Dr. Lowdermilk's treatment of Sandhill Diamond, as a specialist in equine veterinary practice, fell below the accepted standard of care due to the following errors:

1. Failing to maintain at least normal fluids in the horse which Dr. Lowdermilk had diagnosed as having thromboembolic colic;

2. Failing to administer fluids through the insertion of a nasogastric tube;

3. Failing to administer anticoagulants and antibiotics upon diagnosis of thromboembolic colic;

4. Failing to administer antibiotics which had been balanced against gram negative and gram positive organisms;

5. Administering an antibiotic on October 10 that had not been balanced against gram negative and gram positive organisms;

6. Failing to repeatedly run various tests, including a complete blood count, packed cell volume, total protein, rectal exams and an abdominal tap; and

7. Administering Naquasone, a diuretic, to a dehydrated horse.

Under Louisiana law, which this court sitting in diversity is *Erie*-bound to follow, standards governing medical malpractice actions control in veterinary malpractice cases. *Ladnier v. Norwood*, 781 F.2d 490, 492 (5th Cir.1986); *Carter v. Louisiana State University*, 520 So.2d 383, 387 (La. 1988). The locality standard of care is inapplicable to a veterinary specialist. *Id.*

Under La.Rev.Stat.Ann. § 9:2794 (West Supp.1989), a plaintiff in a malpractice action bears a three-part burden:

1. [W]here the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by [veterinarians] ... within the involved medical specialty.

2. That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and

3. That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Injury alone does not raise a presumption of negligence. *Id.* at § 9:2794.C. As this court held in *Sewell v. United States*, 629 F.Supp. 448, 454–55 (W.D.La.1986):

In determining whether the plaintiff has met his burden of proof, the court relies upon the testimony and opinion of medical experts. [Citations omitted.] This expert testimony must be tempered by the knowledge that Louisiana law does not hold the physician to a standard of perfection.

*See also, Garrett v. United States*, 667 F.Supp. 1147, 1150–51 (W.D.La.1987). This court concludes that the plaintiffs have not come forward with sufficient evidence to sustain their burden of proof with respect to any of the elements required by La.Rev. Stat.Ann. § 9:2794.

## THE DEGREE OF CARE ORDINARILY PRACTICED BY EQUINE VETERINARY SPECIALISTS VERSUS ALLEGED BREACHES

■ In an effort to establish the applicable standard of care, plaintiffs offered the testimony of Dr. J. Eugene Schneider. Dr. Schneider is an associate professor at the Department of Surgery and Medicine at Kansas State University. The issues of

---

**4.** *See,* Deposition of Dr. Robert D. Lewis at 110.

whether plaintiffs established the applicable standard of care and whether Dr. Lowdermilk breached that standard are so intertwined that the court will address them together.

If one listened only to the testimony of Dr. Schneider, it would appear that there is but a singular way to treat a horse diagnosed as having colic or suspected of having thromboembolic colic. Fortunately, this court had the benefit of not only Dr. Schneider's testimony but that of Drs. Lewis, Bertone and Lowdermilk. The sum total of this testimony, as will be discussed more fully hereinafter, satisfies the court that there is significant latitude recognized as acceptable in the specialty of equine veterinary medicine when treating colic and, in particular, thromboembolic colic.

According to Dr. Schneider, the equine veterinarian treating for thromboembolic colic should first determine whether the horse is dehydrated. This may be done by what is known as the skin turgor test, which involves pinching the skin in the neck area and observing skin reaction. Monitoring water intake and urinary outflow is another method to determine dehydration. Diagnostic tests, including packed cell volume and total protein tests, are also recognized means. Schneider testified that the total protein test is probably the most accurate method. Dr. Bertone testified, however, that the most accurate determinator of dehydration is to ascertain the horse's body weight and then observe how much fluid loss occurs. Dr. Bertone also placed great weight on clinical signs such as those as would be obtained from the skin turgor test.

Dr. Lowdermilk performed the skin turgor test and obtained the packed cell volume count. The skin turgor test was done repeatedly, according to Dr. Lowdermilk. Based on these tests, he did not believe

Sandhill Diamond was dehydrated between October 7 and 10.

After determining whether the horse is dehydrated, Dr. Schneider would administer fluids. Dr. Schneider testified that Dr. Lowdermilk breached the accepted standard of care by not administering fluids beginning on the 7th. Dr. Schneider's opinion, however, is flawed because it is based on the assumption that Sandhill Diamond did not drink anything after the race on October 5. As indicated, the testimony concerning how much fluids the horse drank is inconclusive. Accordingly, an opinion as to whether the horse was dehydrated, based on water intake, is equally inconclusive.

According to Dr. Lowdermilk—and there is no testimony to the contrary—there were no clinical signs of dehydration on October 7, 8, 9 or 10. This is supported by the skin turgor tests and the packed cell volume test. Dr. Bertone testified that the level of dehydration that would be necessary to have an adverse effect on the intestinal tract would have shown up from the skin turgor test. If this level of dehydration had been present, the horse would also have shown an elevated heart rate, sweating, anxiety and poor coloration. According to Dr. Bertone, a horse can be up to 4 per cent dehydrated and not show any clinical signs of dehydration. In order for a horse to suffer intestinally from dehydration, it would have to be 10 per cent dehydrated. Studies as to how long it would take for a horse to be 10 per cent dehydrated with no water intake are inconclusive. One study showed that 10 per cent dehydration, with zero intake, could occur as early as two days while another study showed it would take seven days.[5]

In addition to determining if the horse is dehydrated and then administering fluids, Dr. Schneider testified that the following should be done: (1) administer antibiotics in

5. Dr. Schneider testified that Naquasone should not have been administered because, being a diuretic, it would have aggravated the horse's dehydration. Since adequate proof as to whether Sandhill Diamond was dehydrated has not been provided, Dr. Schneider's opinion is unpersuasive. Moreover, it is clear that the horse suffered a swollen knee. The purpose of giving Naquasone was to draw excess fluid from the knee. Toward this end, the medication appears to have worked. Davidson testified that the knee was better the next day. Though Naquasone is designed for cattle, Dr. Bertone testified that it is commonly used in treating horses.

all cases from day one; (2) conduct a variety of diagnostic tests, including complete blood count, packed cell volume, total protein, rectal exams and an abdominal tap; and (3) administer anticoagulants.

With regard to the use of antibiotics, Dr. Lowdermilk testified that he did not deem them necessary as the mare's vital signs were normal on October 7–8, and the horse seemed to improve on October 9–10. Dr. Bertone expressly disagreed with Dr. Schneider's statement that antibiotics should be given in every case. She felt that there was no reason to give antibiotics unless there was a clinical indication of their necessity. Dr. Lewis testified that antibiotics would be used only if there was an indication that the horse's abdominal cavity had been exposed to bacteria. He referred to such instances as "profound cases." [6]

Dr. Schneider's testimony that Dr. Lowdermilk should have repeatedly run various tests met with considerable disagreement. Dr. Bertone testified that whether to conduct the tests discussed by Dr. Schneider depended entirely on clinical symptoms displayed by the horse. Given the symptoms related by Dr. Lowdermilk, Dr. Bertone felt that no additional diagnostic testing was warranted. Dr. Bertone also cited a survey that questioned numerous veterinarians about how many diagnostic tests they used in colic cases. The results of this survey showed that only 10 per cent of the veterinarians questioned performed blood work or an abdominal tap. Dr. Bertone further testified that she would not perform an abdominal tap if the horse's vital signs were normal or if the horse appeared to be improving.[7] Dr. Bertone expressed the same opinion about the necessity of an analysis of blood gases.[8]

With regard to the necessity of rectal exams, Dr. Lewis testified that the general trend with practitioners in the field is that this is an undesirable test. Dr. Lewis found no fault with this trend. Rectal exams involve a certain amount of risk. Dr. Lewis testified that rectal rupture in a horse can easily occur during the course of a rectal exam. Rectal exams, according to Dr. Lewis, are less likely to be done in a stall environment. He testified that he rarely performs this test unless the horse is confined to a stanchion. Dr. Lewis cited two examples of the hazards of conducting a rectal exam without a stanchion—in one of these cases, he suffered a shattered arm and, in the other, the mare dropped and broke his partner's arm.

Based on the cumulative testimony of Drs. Schneider, Bertone and Lewis, the court agrees with Dr. Lowdermilk that there is not a cookbook formula for treating thromboembolic colic. It is also noteworthy that Dr. Schneider's opinion was based not only upon the inconclusive assumption that Sandhill Diamond was dehydrated on the 7th, but also upon the assumption that an affirmative diagnosis of thromboembolic colic had been made by Dr. Lowdermilk. On this point, Dr. Lowdermilk testified at trial that he "strongly suspected" and "felt relatively sure" that the horse suffered thromboembolic colic. The clinical signs, however, indicated, if anything, a mild case. Dr. Bertone testified that the clinical signs on October 7 would not have caused her to treat for thromboembolic colic. She further testified that a conclusive diagnosis could only be made after an exploratory laparotomy or necropsy—an examination of the body after death.

Two conclusions can be drawn from the testimony of Drs. Schneider, Bertone and Lewis: (1) experts in equine veterinary medicine disagree on the proper treatment for thromboembolic colic; and (2) the same experts disagree on how Sandhill Diamond

**6.** *See,* Deposition of Dr. Lewis at 70–71.

**7.** An abdominal tap would provide further data as to whether there is inflammation in the abdomen.

**8.** Specifically, Dr. Bertone testified that this was simply an additional test to discern what state the horse was in. According to Dr. Bertone, blood gases are usually analyzed when the animal is in serious distress or shock. She also indicated that the test had to be run to a lab immediately after taking a sample; thus, without direct access to a blood gas machine, this would not be practical.

should have been treated. The effect of these conclusions is that plaintiffs have failed first to sustain their burden of proving the degree of care ordinarily practiced by equine veterinary specialists and, second, that Dr. Lowdermilk either lacked this degree of knowledge or skill or failed to use reasonable care and diligence.

The findings of fact outlining treatment given by Dr. Lowdermilk indicate a pattern of treatment consistent with a strong suspicion of thromboembolic colic. This conclusions is drawn both from the testimony of both Drs. Bertone and Lewis. Dr. Bertone expressly examined each type of treatment given by Dr. Lowdermilk and found no error. Dr. Lewis testified that Dr. Lowdermilk administered "routine-type medication that is used for treating colics." [9] Dr. Lewis continued: "As far as any drugs he [Dr. Lowdermilk] had administered which contributed to the demise of the horse, I would say no." [10]

To summarize, Dr. Schneider's testimony, when considered with that of Drs. Bertone, Lewis and Lowdermilk does not convince the court that his recommended method of treatment evidences the degree of care ordinarily practiced by equine veterinary specialists treating colic or "a strong suspicion" of thromboembolic colic. Even assuming, *arguendo*, that Dr. Schneider's method controlled, his opinion that Dr. Lowdermilk breached the standard is based upon two assumptions which this court rejects. The first erroneous assumption is that Sandhill Diamond was dehydrated. This assumption has not been supported by

adequate proof. The second assumption is that Dr. Lowdermilk conclusively diagnosed Sandhill Diamond as having thromboembolic colic on October 7. As already indicated, this was not the case. The court finds that the treatment given by Dr. Lowdermilk is consistent with the treatment that either Dr. Bertone or Dr. Lewis would have given in a race track environment. The court believes that the standard of care described by Drs. Bertone and Lewis is a more accurate representation of the degree of care ordinarily practiced by equine veterinary specialists. Accordingly, plaintiffs have failed to sustain the first two elements of their burden of proof required by La.Rev.Stat.Ann. § 9:2794.

## PROXIMATE CAUSE VERSUS THE INEVITABLE DOWNFALL

■ As set forth in the findings of fact, it was Dr. Lewis' opinion that Sandhill Diamond died due to an overwhelming septic shock that resulted in cardiac failure. The septic shock was triggered by a thromboembolic episode that was due to significant cranial mesenteric artery disease. This disease was caused by the inordinate concentration of strongylus vulgaris larvae which had not been treated for nine months. Dr. Lewis' examination of the cranial mesenteric artery revealed that it was abnormally large for a three-year-old mare. This finding was consistent with his conclusion that the horse had a severe case of thromboembolic colic which originated from the migration of bloodworms.[11] Since Dr. Lewis was

---

**9.** *See,* Deposition of Dr. Lewis at 115.

**10.** *See,* Deposition of Dr. Lewis at 115–16. Dr. Lewis later qualified this statement by saying that, "In all honesty, there is probably some additional things we would have done with—based on that diagnosis. *Id.* at 123. He further testified, however:

How important or how significant they would have been on this case, I've got a lot of questions about. Putting myself into a race track practicing environment knowing what I know goes on and with the responsibilities a veterinarian has during the day, I don't know how much more I would have gotten done for this mare either.

Now, I'm just basing—like I said, based on his deposition, this mare clinically didn't look

that bad during the week, and that's what I'm basing it on.
*Id.* at 123–24.

**11.** Dr. Bertone's opinion as to the cause of death is found at page 95 of her deposition:

Possibly there was an increase or another thrombolis or embolis release occluding a larger artery or causing infarction [the formation of a localized area of tissue that is dying or dead because it has been deprived of its blood supply due to an obstruction by embolism or thrombosis] of a larger segment of intestine. Possibly there was vasospasm [contraction of vessels] of these, of the larger segment of intestinal arteries, secondary to the disease that was already going on there, and actually that has been shown to be a

the only veterinarian who observed first-hand the condition of Sandhill Diamond's intestines, the court accords his testimony as to the cause of death considerable weight.

Due to the extent of the infestation of parasites and the resulting disease, Dr. Lewis expressed serious doubt as to whether *any* treatment between October 7 and 11 could have saved Sandhill Diamond. On this point, he testified:

> But if one assumes that this shower of thrombi all occurred as the result of the race on Sunday and all these clots dropped at one time, then I doubt that—I doubt that medical therapy was going to get this mare over her problem.
>
> \* \* \* \* \* \*
>
> On this particular case ... obviously this mare had grave secondary complications but she also had a grave condition.
>
> Had I gotten this [mare] earlier, I don't know if it would have affected the outcome really because of the degree of disease she had. That's the point I was trying to make.
>
> \* \* \* \* \* \*
>
> [T]his mare had enough disease that if I had gotten her earlier in the case, I got a strong suspicion that the outcome inevitably may have been the same because she had a severe case of it, but I don't know that, you know.

Lewis Deposition at 55, 77, 110.

Similarly, Dr. Bertone testified that the thromboembolic episode that occurred on October 10 or 11 could not have been prevented by prior treatment. This opinion was based on two facts: (1) the extent of the infestation of strongylus vulgaris larvae found by Dr. Lewis; and (2) the location of the infected areas of the large colon. More specifically, there were gangrenous portions of the large colon that could not be surgically removed and would ultimately result in the horse's death.

Dr. Bertone also testified that the death was not preventable by Dr. Lowdermilk

because the episode can occur at any time, without notice, in a horse that has this migrating parasite. With respect to the suddenness that the disease may cause death, Dr. Lewis testified:

> Some of these horses can be normal one day, sick the next, and literally dead within 48 hours if it's a severe enough case.
>
> \* \* \* \* \* \*
>
> Some of these cases, as I said, will really sneak up on you. They are very insidious, and they can really fool you.
>
> \* \* \* \* \* \*
>
> [In] any abdominal disease case things can happen fast once they get to a point.... A mare can—a brood mare can twist a large colon and be dead in two hours, if you are talking about generic abdominal disease. But things can happen remarkably fast in the abdomen of a horse.

Lewis Deposition at 80, 116–17.

All of the veterinarians who testified, including Dr. Schneider, stated that the soundest manner to prevent the infestation of parasites and virtually eliminate the possibility of any colic is to have the horse "wormed" every 60 days. Sandhill Diamond had not been wormed in over nine months at the time of her death. Even Dr. Schneider admitted that this failure properly to worm the horse would have contributed to the migration of bloodworms that resulted in the thromboembolic colic. According to Dr. Bertone, nothing could have saved Sandhill Diamond except a proper worming program.

A worming treatment costs approximately $10. Davidson testified that she doesn't worm a horse while it is on the race track circuit. The reason given by Davidson is that she would have to stop training the horse for a day. Also, she was under the impression that the drugs would remain in the system for approximately a week and would show up in the tests performed after each race, causing "problems." Dr. Lewis

---

more common than actual thrombi. When they have dissected these out, it is very hard to find the thrombus. It seems that the ves-

sels become very hyper-reactive and just clamp down and occlude blood flow.

**732**

testified, however, that good trainers of race horses will worm every 60 days.

Based upon the foregoing, this court concludes that the precipitating cause of Sandhill Diamond's death was overwhelming septic shock that was triggered by a thromboembolic episode. The episode was made possible by severe cranial mesenteric artery disease that resulted from the migration of strongylus vulgaris larvae. The sole cause of the migration of this parasite was failure to maintain a proper worming program—not the actions or inactions of Dr. Lowdermilk. Accordingly, even if the court were to find—which it clearly does not—that Dr. Lowdermilk breached the accepted professional standard of care, then the court would nonetheless deny plaintiffs recovery because neither the treatment given by Dr. Lowdermilk nor any additional treatment would have prevented the thromboembolic episode and septic shock that resulted in Sandhill Diamond's death.

## THE COUNTERCLAIM

■ At the end of October 1986, the Morelands were sent a statement of charges for services provided by Dr. Lowdermilk or his partner between September 1 and October 11. In response to a complaint by Mrs. Moreland regarding an itemization of charges, Dr. Lowdermilk mailed a letter to her on November 12, 1986, setting forth with some detail services rendered. In January of 1987, the Morelands were sent a past-due notice showing a balance of $863. Demand letters were sent to the Morelands on August 24, 1987 and September 15, 1987. Mrs. Moreland admitted receiving these bills and demand letters but stated that she did not pay the bills because she felt that Dr. Lowdermilk did not render proper medical services.

It is undisputed that the services were rendered. The court has concluded that these services were adequate and within the accepted standard of care for equine veterinary medicine. Accordingly, pursuant to La.Rev.Stat.Ann. § 9:2781.A, the Morelands are liable for the past-due balance, plus reasonable attorney's fees for collection of the claim. The attorney's fee

award shall be limited solely to the prosecution of the counterclaim and shall not include services rendered in defense of plaintiffs' complaint. The parties are encouraged to agree on a reasonable amount of attorney's fees while reserving the right to contest the award on appeal. If counsel are unable to agree on an amount, counsel for the counterclaimant shall file a motion for attorney's fees with supporting affidavits and documentation. The motion will be handled in the court's regular motion practice.

Counsel for Dr. Lowdermilk is instructed to submit, within ten (10) days of today's date, a proposed judgment that has been approved as to form and content by counsel for the plaintiffs. The judgment shall reflect the court's ruling not only on the counterclaim but also on the main demand.