416 So.2d 351 (1982)
Carolyn MORAN
v.
Odell DEAN, M.D., Anthony J. Hackett, Jr., M.D., and Flint-Goodridge Hospital of Dillard University.
No. 12986.
Court of Appeal of Louisiana, Fourth Circuit.
June 8, 1982.
*352 Margaret A. LeBlanc, New Orleans, for plaintiff-appellant.
Wiedemann & Fransen, Edmund W. Golden, New Orleans, for defendants-appellees.
Before GULOTTA, GARRISON and BARRY, JJ.
BARRY, Judge.
This appeal is from the dismissal of Carolyn Moran's medical malpractice lawsuit[1] arising out of the delivery and death of her newborn child. Defendants are Dr. Odell Dean, the physician that followed her during pregnancy, Dr. Anthony Hackett, who was on call for Dr. Dean, and Flint-Goodridge Hospital where the delivery took place. Our concern is a review of the Trial Judge's evaluation of conflicting expert testimony.

FACTUAL BACKGROUND
On Sunday afternoon June 16, 1974, this 21 year old plaintiff began having labor pains and attempted to contact Dr. Dean. During her pregnancy plaintiff had been seen only by Dr. Dean and told the child would be delivered at Methodist Hospital. Plaintiff did not know he was on vacation and was informed by Dr. Dean's answering service that Dr. Hackett was taking his calls and told to proceed to Flint-Goodridge Hospital.
At approximately 5:30 p. m. plaintiff was admitted to Flint-Goodridge. Upon reaching the obstetrics unit the nurse on duty, Edwina Morgan, a licensed practical nurse, took a brief history and recorded plaintiff's blood pressure, pulse, respiration and temperature. She was prepped, fetal heart tones taken, and her pains assessed, but was not examined to determine dilation of the cervix. At 6:15 the information was given to the supervisor who called the answering service. At 6:30 Dr. Hackett first called to inquire about plaintiff's condition, was given the above data, and at 6:35 prescribed 100 mg. of demerol and 20 mg. of largon. At 7:00 p. m. the nurse's notes indicate the *353 contractions subsided from moderate to mild and plaintiff was asleep. At 7:30 Dr. Hackett called and was told her condition. Plaintiff awoke at 9:15 with complaints but was in the separation period prior to active labor. At 10:15 Dr. Hackett called and ordered a second round of the same dosages of demerol and largon. At 11:00 there was a "bloody show" and moderately high pains at regular intervals. At 12:02 plaintiff's membranes (water bag) ruptured spontaneously and the amniotic fluid contained a large amount of meconium (a stool which is usually passed after birth). At 12:05 a. m. Dr. Hackett was notified. At 12:20 there was delivery of a 6 pound, 10 ounce viable female with only nurse Morgan in attendance. At 12:21 Dr. Hackett advised he was in route.
The hospital chart reveals there was no cry at birth and coloring was pink with cyanosis (blue) of the extremities. The nurse suctioned fluid and blood from the nose and mouth, noted respiratory effort was poor with deep retractions, and administered oxygen by mask. At 12:35 Dr. Hackett arrived, also noted breathing difficulty, and ordered resuscitation. He felt the infant was having problems and ordered the baby placed in the nursery incubator for additional oxygen. The notes show his order was at 12:45 at which time the nurse reported there was a weak cry upon stimulation, the child was still retracting on respiration, but the color and breathing had improved. At 1:00 a. m. the baby continued retracting on respiration. Dr. Hackett left the hospital between 1:30 and 1:45 a. m. (the time is not in the hospital record). The 2:00 a. m. note indicated respiration was "poor" and oxygen was administered by mask. At 2:10 the supervisor and Dr. Evans (the emergency room physician) were present and found respirations were shallow. The infant was pronounced dead at 2:22 a. m. Dr. Hackett did not request any tests or consult a pediatrician before leaving the hospital.
Plaintiff sued alleging negligent acts of omission, namely: Dr. Dean was unavailable and Dr. Hackett was not present to deliver the baby; Dr. Hackett ordered medication without personally examining plaintiff; the baby's death was caused by improper care and treatment; the hospital did not have a staff doctor on duty.
The Trial Judge dismissed plaintiff's suit because she did not prove, by a preponderance of the evidence, that either Doctor or the hospital did anything contrary to the standard of care in the community.

ARGUMENT
Plaintiff argues her treatment prior to delivery was insufficient because the only person in attendance was the nurse. Also, there was no examination to determine dilation of the cervix and this information should have been available when Dr. Hackett telephoned. Plaintiff's expert, Dr. George Sterne, a pediatrician, testified it was normal in the New Orleans area for a nurse to examine the expectant mother to determine dilation and record fetal heart tones. He felt an accurate judgment of the time for delivery was impossible based solely on the heart tones and contractions. Defendants' two experts, Dr. John Lindner and Dr. Simon Ward, obstetricians, testified there was no correlation between Dr. Hackett's absence during delivery and the child's death. Both defendants' experts also said in most hospitals in the New Orleans area O.B. nurses do not check dilation unless requested by the attending physician and it was usual for the physician to be guided by the nurse's observations through periodic phone calls. The three experts agreed all doctors want to be present for a delivery, but a rare absence does occur. Dr. Ward said "... it is a community standard for the doctor to be in attendance ..."
Next plaintiff argues Dr. Hackett was negligent by twice prescribing demerol and largon without an examination. Dr. Sterne said it was reasonable to order the first dose but it should not have been repeated absent an examination. Defendants' experts thought ordering drugs 6 and 2 hours prior to delivery was appropriate even without seeing the patient.
*354 Dr. Sterne testified when plaintiff's water bag broke with a large amount of meconium in the amniotic fluid it clearly indicated the infant was in distress. He said the fetus had been "compromised in terms of oxygen" and should have been delivered "as expeditiously as possible." He estimated only 1% of all deliveries discharge amniotic fluid containing meconium. Dr. Lindner said meconium was found in the fluid in many instances and its presence did not indicate what was occurring in the uterus. Dr. Ward testified until the membranes ruptured revealing a large amount of meconium, there was no reason to suspect a high risk pregnancy because some meconium is not unusual; however, this definitely pre-alerts to the possibility of a problem. Dr. Ward opined because plaintiff was in the final stage of labor all that could be done was deliver. He felt at that point he would not have proceeded any differently because of the meconium.
The medical experts also disagree on the type and sufficiency of treatment for the child after birth. Dr. Sterne said the APGAR (a device used by less experienced personnel to evaluate newborns) score of 4, with a 2 reflecting the heart rate, indicated the child was revivable but required vigorous attention. He felt strongly there was a lack of diagnostic procedures (x-rays or additional tests) and the treatment was inadequate. He stated the deep retractions with respiration indicated either a central nervous system problem (from drug depression), or asphyxia, or both.
It was Dr. Sterne's opinion the attempts to clear the lungs and airways were insufficient and with adequate ventillation methods the infant would have survived. He suggested if there was no response to the applied resuscitation, the next step was intubation and positive pressure. He also felt because the records indicated the child was in trouble Dr. Hackett (a general practitioner) should have consulted a specialist. It was his opinion that Dr. Hackett's treatment was below the medical standard in the community.
Both defendants' experts felt the nurse performed properly under the circumstances and Dr. Hackett could not have avoided the outcome. Dr. Lindner attributed the cause of death to aspiration of amniotic fluid which led to bilateral pneumonia, a diagnosis with which Dr. Sterne agreed. He stated the fluid had been aspirated into the lungs and it would have been impossible to intubate the child with success. He disagreed that the child was getting worse and stated retractions with respiration is not necessarily indicative of more distress unless it is getting progressively worse. His analysis of the hospital record indicated the child was improving and he said he would have done nothing differently.
Dr. Ward felt death was caused by asphyxiation in the uterus and after delivery the baby had no chance to breathe because with clogged lungs (which were filled with fluid) it is very difficult for oxygen to enter. He also agreed that the record showed the child actually improved after delivery and Dr. Hackett's treatment was adequate.

NEGLIGENCE OF DR. DEAN
Plaintiff argues that it was negligence "on the part of a physician" for failing to attend to a patient in need of his care or services; however, plaintiff does not specify if she is referring to Dr. Dean or Dr. Hackett.
Plaintiff testified Dr. Dean was her regular attending physician during pregnancy and she did not know he was on vacation when she telephoned for help. Apparently it is customary for a medical colleague to "cover" and this practice is not questioned here. We do feel Dr. Dean was remiss in failing to notify his patient of his anticipated absence and providing his replacement with plaintiff's medical history to assist in the treatment.
Even though Dr. Dean is a co-defendant, he was not called by either side to testify. There is no evidence or argument connecting Dr. Dean with the treatment administered by Dr. Hackett or Flint-Goodridge and his acts of omission are not causally connected to plaintiff's treatment or the infant's death.

*355 NEGLIGENCE OF FLINT-GOODRIDGE
Plaintiff's petition relating to the hospital's negligence is vague and inaccurate. Plaintiff avers that Flint-Goodridge "negligently refused to have one of its doctors see her to provide necessary medical attention ... and refused or failed to take ordinary necessary precautions or take ordinary necessary tests ...". We find no evidence that any of the hospital's personnel refused medical attention. The O.B. nurse tended to plaintiff's needs during several hours of labor and successfully delivered the baby. The hospital provided essential facilities and its nurse performed in accordance with the telephonic instructions from Dr. Hackett. We find no acts of omission or negligence in any of the services rendered by Flint-Goodridge Hospital.

NEGLIGENCE OF DR. HACKETT
There is no explanation in the record why Dr. Hackett failed to go to the hospital from 6:30 p. m. until 12:35 a. m. There is evidence that a simple examination to ascertain dilation of the cervix, coupled with the fetal heart tones, would have alerted Dr. Hackett to the imminent birth, but he failed to request the examination. Dr. Hackett's second drug prescription two hours before delivery without examining an unfamiliar patient is suspect. The record very convincingly shows, as per Dr. Sterne and Dr. Ward, that meconium in the amniotic fluid is a definite danger warning. Had Dr. Hackett tended to his patient at delivery, he should have recognized this warning sign and acted accordingly. But the transcript shows otherwise when he was questioned:
Q. If you had been there and you know that the meconium, would that indicate to you as a physician that you will have to give some sort of special treatment to the child when the child finally does come?
A. No, it does not.
In striking contrast, when asked the same question, Dr. Sterne, a pediatrician specialist, said the presence of meconium "... is presumptive that the fetus has been compromised in terms of the supply of oxygen..." and the infant was in trouble. Dr. Sterne elaborated and said a large amount of meconium required special treatment for the fetus, i.e., delivery as expeditiously as possible and the presence of a physician to immediately initiate relief procedures.
The hospital provided the APGAR device to evaluate the newborn's condition. This was done by the nurse right after birth (before Dr. Hackett arrived) and provided a rating from five components; heart rate, respiratory effort, muscle tone, reflex irritability and color. Each component is rated from 0 to 2. This infant received a 2 for heart rate and, according to Dr. Sterne, the baby was readily revivable. Respiratory effort and muscle tone scored a 1, and a 0 was scored for reflex response and color. This infant's total score 4, according to the pediatric expert, "suggest the child is just on the borderline requiring vigorous attention". Despite having this revealing and vital information, routine procedures were followed. The O.B. nurse was questioned concerning Dr. Hackett's actions when he finally arrived fifteen minutes after the delivery. She answered that Dr. Hackett re-suctioned the infant, performed a physical examination, said the baby's condition had improved, and "Well, its okay." When Dr. Hackett was asked "Did you give any other orders to Ms. Morgan with respect to the baby, other than having the child placed in the incubator with heat and oxygen?", he responded "No other orders."
Defendants' two obstetrical experts testified this infant was "pre-ordained" to die, was "doomed", and nothing could be done. In contrast, the pediatrician would have administered a small dose of a narcotic antagonist to determine if the respiratory depression was due to the drugs administered prior to delivery. Dr. Sterne said it was appropriate to see if a nose catheter or airway in the mouth was expedient, plus a chest x-ray to determine the presence of a collapsed lung, pneumonia, or if surgery was needed. Dr. Sterne stated that incubator oxygen, as ordered by Dr. Hackett, was insufficient. He emphasized the baby did *356 not have meconium aspiration, rather the child died from aspiration of plain amniotic fluid. Despite defendants' experts stating the child could not survive, conclusions they reached after reading the hospital records, Dr. Hackett, during his brief time at the hospital, concluded otherwise. He testified the baby was "okay" despite all of the medical history to the contrary. Dr. Hackett left the baby between 1:30 and 1:45 a. m. Dr. Sterne stated between 1:00 and 2:00 a. m. the baby deteriorated significantly because its color was "pale", the efforts were "poor", and "the baby is rapidly going downhill." This evidence is conclusive from reading the hospital records, yet Dr. Hackett departed when the infant was in obvious critical condition and minutes before death.
In a medical malpractice suit, plaintiff bears the burden of establishing the physician's deviation from the standard of care required by others in the same field or specialty. Ardoin v. Hartford Accident and Indemnity Co., 360 So.2d 1331 (La. 1978). Plaintiff must also establish a causal relationship between the physician's alleged negligence and the injury resulting therefrom. Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3rd Cir.) writ denied, 321 So.2d 363 (La.1975).
Dr. Hackett is a general practitioner without specialized training in obstetrics. His experience was gained over the years by active practice. When he assumed Dr. Dean's responsibility for care of the plaintiff, he did so without any medical history or records. After plaintiff's labor pains started she summoned Dr. Hackett but his only response was three telephone calls to the hospital. Dr. Hackett did not request an examination for dilation of the cervix, information which would have indicated time of delivery. AGPAR tests and a large amount of meconium were telltale signs of obvious distress, but were totally ignored except for one effort at resuscitation and placing the newborn under oxygen. Crucial diagnostic tests were not made despite noted cyanosis and ever worsening breathing retractions. Supplemental breathing techniques were omitted. Dr. Hackett performed minimal services and did not recognize the crisis which accounts for no consultation with a specialist.
Considering the totality of circumstances, we find there is ample evidence Dr. Hackett did not exercise ordinary skill employed under similar circumstances by members of his profession. We conclude he failed to use reasonable care, diligence, or his best judgment, and his negligence is causally connected to the outcome. Dr. Hackett's treatment was below acceptable medical standards in our community and the lower court opinion to the contrary is clearly wrong.
Our jurisprudence is sparse on the amount of damages for the negligent death of an infant. We feel consideration here should be given to the age of the child, mental anguish of the parent, and loss of future love and companionship.
Plaintiff's baby girl lived only two hours. Recovery for the infant's suffering, though heritable, was not requested. Plaintiff was sedated and asleep when death occurred. She learned of the tragedy when she awoke several hours later and became hysterical. Later Dr. Dean prescribed valium for her nerves.
A mother was awarded $50,000.00 and the father $40,000.00 for the loss of a three month old son in Searcy v. Porter, 381 So.2d 540 (La.App. 2nd Cir. 1980). Parents of a stillborn were awarded $20,000.00 in Danos v. St. Pierre, 402 So.2d 633 (La.1981).
None of the cited cases are similar to the circumstances of this case. Plaintiff went through the ordeal of childbirth without her physician or his stand-in. She was aware the infant was in distress. She carried the fetus nine months in anticipation of a normal delivery and the expectation of motherhood. Mental anguish from this traumatic experience was evident and loss of future love is obvious. Considering all elements an award of $40,000.00 appears reasonable and appropriate.
For the reasons assigned above, the judgment of the district court dismissing plaintiff's lawsuit as to Dr. Hackett is reversed *357 and set aside. Judgment is hereby entered in favor of Carolyn Moran against Dr. Anthony Hackett in the amount of $40,000.00, plus legal interest from date of judicial demand until paid. The judgment as to Dr. Odell Dean and Flint-Goodridge hospital of Dillard University is affirmed. All costs are assessed against Dr. Hackett.
REVERSED IN PART; AFFIRMED IN PART.
NOTES
[1] This lawsuit pre-dates LSA-R.S. 40:1299.41 et seq., the medical review panel procedure which pertains to malpractice occurring after September 1, 1975.