579 So.2d 1008 (1991)
Rose B. PARMELEE, individually and as administratrix of the Estate of Richard C. Parmelee
v.
David G. KLINE, M.D. and Ochsner Foundation Hospital.
Rose B. PARMELEE, wife of/and as administratrix of the Estate of her husband, Jill E. Parmelee, daughter of/and Chris A. Parmelee, daughter of the deceased, individually and on behalf of the deceased Richard C. Parmelee
v.
PATIENT'S COMPENSATION FUND.
Nos. 90-CA-600, 90-CA-601.
Court of Appeal of Louisiana, Fifth Circuit.
March 13, 1991.
Rehearing Denied June 17, 1991.
*1010 William J. Guste, Jr., Atty. Gen., Ivor A. Trapolin, L. Kevin Coleman, Trial Atty., Trapolin & Coleman, New Orleans, La., for defendant/appellant.
Darryl J. Tschirn, Metairie, La., for plaintiffs/appellees.
Before GAUDIN, GRISBAUM and WICKER, JJ.
WICKER, Judge.
This appeal arises from a medical malpractice action filed by the decedent's wife and children against Ochsner Foundation Hospital (Ochsner), Dr. David G. Kline and Dr. Susan Hemley. Prior to trial there was a settlement releasing Ochsner and Dr. Susan Hemley, but reserving rights against Dr. Kline individually as well as vicariously for Dr. Hemley. The jury found Dr. Kline 40% negligent; Dr. Hemley 50% negligent and Ochsner 10% negligent and awarded a total of $750,000.00 in damages. The trial judge rendered judgment casting Dr. Kline for 100% of $500,000.00. We set aside the judgment of the trial judge; reverse the jury finding of individual and vicarious liability of Dr. Kline and dismiss plaintiffs' claims against Dr. Kline. We remand plaintiffs' action in the consolidated case against the Patient's Compensation Fund (the Fund).
Richard Parmelee died at Ochsner following neurosurgery. His wife, Rose Parmelee, sued Dr. Kline, Dr. Susan Hemley and Ochsner for medical malpractice individually and as administratrix of the estate. The decedent's two children, Jill E. Parmelee and Chris A. Parmelee, also filed suits against the defendants. Plaintiffs sued the Fund in a consolidated action.
Prior to trial plaintiffs settled with Dr. Hemley and Ochsner reserving the following claim:
claimants further reserve all rights and causes of action against the Louisiana Patient's Compensation Fund as it pertains to any negligent action or inaction of David Kline M.D. as well as for any negligent action or inaction of Susan Hemley, M.D. for which David Kline, M.D. may be responsible for pursuant to Louisiana Civil Code Article 2320.
At the hearing on the settlement plaintiffs' counsel stated:
we are not here releasing Dr. Kline from any vicarious liability of Susan Hemley as toward him and any insurer, state or independent agency or any fund. We are not releasing those. We wanted to make that clear for the record.
We are specifically reserving all those rights as against anyone who may be responsible as an insurer of Dr. Kline and any vicarious liability he may have for Dr. Susan Hemley.
*1011 Counsel for the Fund denied liability or responsibility for Dr. Kline. Dr. Kline's counsel argues Dr. Kline, an employee of L.S.U., is covered by the separate statute for a state qualified health provider, La. R.S. 40:1299.39 as opposed to the statute covering private health care providers, La. R.S. 40:1299.41 et seq.
A jury trial proceeded against Dr. Kline alone. The jury awarded a total of $750,000.00 damages which the trial judge reduced to $500,000.00. The Parmelees have filed a cross-appeal seeking to have the jury award of $750,000.00 reinstated. They assert Dr. Kline waived all of his rights under the malpractice statute, including limitation, by failing to file an affirmative defense and/or by waiving his appearance before the medical review panel. We find the cross-appeal to be moot having concluded there was error in the jury's finding of liability on Dr. Kline's part.
Dr. Kline, defendant/appellant, has specified several errors on appeal. Because we find merit in two of the specified errors, we pretermit a discussion of the remaining specifications of error.
Appellant specifies the following error:
The trial court erred in assessing Dr. Kline with the 50% of the damages attributed by the jury to Dr. Hemley since the plaintiffs had already settled with Dr. Hemley and dismissed her, with prejudice, from the proceedings.
Appellant's counsel states in brief the trial judge in chambers decided to change the jury verdict of 40% attributed to Dr. Kline to 90% of the damages. The judgment of the trial court cast Dr. Kline for 100% of the damages. The record discloses no motion for judgment notwithstanding the verdict was ever filed. Thus, the trial judge altered the judgment on his own motion.
The jury apportioned the percentage of negligence as follows:

Dr. David G. Kline 40%
Dr. Susan Hemley 50%
Ochsner Foundation Hospital 10%
 ____
Total 100%

It awarded the following amounts to the respective plaintiffs:

Rose Parmelee $225,000
Jill Parmelee $100,000
Chris Parmelee $100,000
Richard C. Parmelee $325,000

The total award was $750,000.00. The trial judge reduced the total award to $500,000.00 after applying the statutory limitation in La.R.S. 40:1299.39(f). He then rendered judgment as follows:
in favor of plaintiffs, Rose B. Parmelee in the amount of $150,000, in favor of Rose B. Parmelee as administratrix of the estate of her daughter, Jill E. Parmelee in the amount of $66,666.00, and Chris A. Parmelee, in the amount of $66,667.00, and in favor of the estate of Richard C. Parmelee in the amount of $216,667.00, all against defendant, Dr. David G. Kline plus interest thereon from date of judicial demand until paid.
The jury found Dr. Kline to be 40% negligent, Dr. Hemley 50% and Ochsner 10%. However, the trial judge cast Dr. Kline with 100% of the damages. He first reduced each award proportionately to fall within the $500,000.00 statutory limitation.
Mrs. Parmelee's original award of $225,000.00 comprised 30% of the total jury award of $750,000.00. The trial judge reduced it to $150,000.00 which is 30% of $500,000.00.
Jill E. Parmelee's and Chris Parmelee's jury award each was $100,000.00 which was 13 1/3% of the $750,000.00 amount. This was reduced to $66,666.00 for Jill E. Parmelee and $66,667.00 for Chris A. Parmelee, each representing 13 1/3% of $500,000.00.
Finally, the original award to the estate of $325,000.00 was proportionately reduced to $216,667.00.
Therefore, the trial judge misapplied the jury percentage award by casting Dr. Kline for 100% of the damages instead of the 40% assigned to him by the jury.
La.Code Civ.P. art. 1811 provides:
A. (1) Not later than seven days, exclusive of legal holidays, after the signing of the judgment or, if notice of the signing of the judgment is required under *1012 Article 1913, not later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice, a party may move for a judgment notwithstanding the verdict. If a verdict was not returned, a party may move for a judgment notwithstanding the verdict not later than seven days, exclusive of legal holidays, after the jury was discharged.
(2) A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative.
B. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or render a judgment notwithstanding the verdict. If no verdict was returned, the court may render a judgment or order a new trial.
C. (1) If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.
(2) If the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court orders otherwise.
(3) If the motion for a new trial has been conditionally denied and the judgment is reversed on appeal, subsequent proceedings shall be in accordance with the order of the appellate court.
D. The party whose verdict has been set aside on a motion for a judgment notwithstanding the verdict may move for a new trial pursuant to Articles 1972 and 1973. The motion for a new trial shall be filed no later than seven days, exclusive of legal holidays, after the signing of the judgment notwithstanding the verdict or, if notice of the signing of the judgment is required under Article 1913, not later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice. The motion shall be served pursuant to Articles 1976 and 1314.
E. If the motion for a judgment notwithstanding the verdict is denied, the party who prevailed on that motion may, as appellee, assert grounds entitling him to a new trial in the event the appellate court concludes that the trial court erred in denying the motion for a judgment notwithstanding the verdict. If the appellate court reverses the judgment, nothing in this Article precludes the court from determining that the appellee is entitled to a new trial or from directing the trial court to determine whether a new trial shall be granted.
F. The motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues. [emphasis added].
Article 1811 sets forth the procedure for "a party [to] move for a judgment notwithstanding the verdict." [emphasis added]. La.Code Civ.Proc. Art. 1811(A). In its subsequent provisions, Sections B through F, the article provides the various methods for handling such a motion. Since only a party can move for a judgment notwithstanding the verdict, it was error for the trial judge to do so on his own motion.
Accordingly, the trial court's judgment decreasing the award and percentages of fault is set aside and the jury verdict is reinstated for the purposes of our review. However, we conclude the jury was manifestly erroneous and erred as a matter of law for the following reasons and we reverse the jury verdict insofar as Dr. Kline, the only appealing defendant.
Appellant also specifies the following error:
The jury manifestly erred in finding Dr. Kline negligent and/or vicariously liable, since the plaintiffs failed to carry their burden of proof ... the jury manifestly erred in finding Dr. Kline, as a teacher, liable for the alleged negligence of Dr. Hemley, as a student, since the uncontradicted testimony and evidence *1013 was that even if Dr. Hemley was negligent there was nothing that Dr. Kline could have done to have prevented the damages.
The testimony at trial set forth the following. Richard Parmelee suffered a boating accident in 1981 which left him paralyzed in the right arm and the right diaphragm. Dr. Kline treated him for the injury. In 1985 Mr. Parmelee, who suffered from "phantom pain" in his shoulder, read about the "drez lesion" procedure for the type of pain he was experiencing.
Mr. Parmelee contacted a physician in Colorado who reportedly performed the procedure. He asked Dr. Kline for his medical records. Dr. Kline stated he informed Mr. Parmelee those records were at Ochsner and he had to request them from that facility. Dr. Kline saw Mr. Parmelee shortly thereafter and informed him he could do the procedure.
Mr. Parmelee agreed to have Dr. Kline perform the surgery. On January 13, 1986 Mr. Parmelee entered Ochsner. Dr. Kline performed surgery January 15, 1986. His chief assistant was Dr. Hemley, an L.S.U. Medical School resident in neurosurgery. Dr. Hemley was a medical doctor receiving neurosurgery training under the supervision of Dr. Kline. One medical student and one intern also assisted Dr. Kline in the surgery. Dr. Hemley described the procedure as surgery consisting of "making punctuate lesions in the spinal cord at the region of the dorsal root entry zone." Dr. Kline explained the purpose of the procedure was to alleviate pain.
During surgery Dr. Kline encountered scar tissue which resulted in abnormal bleeding requiring the administration of approximately five pints of blood to Mr. Parmelee. Dr. Kline left the operating room when Dr. Hemley was closing the skin. The operation ended at approximately 8:00 p.m. and lasted approximately five hours.
Dr. Kline testified he left Dr. Hemley with Mr. Parmelee in the recovery room. He left the hospital and was not contacted until he received a telephone call around 2:30 a.m. by either Dr. Hemley or a nurse. He was informed Mr. Parmelee was not moving his extremities. Both Dr. Kline and Dr. Hemley immediately rushed to the hospital.
Dr. Kline began removing staples in the recovery room in order to evacuate blood. A second surgery was performed to remove blood clots which had compressed the spinal cord. Unfortunately the second surgery did not prevent the necrosis or killing of the spinal cord resulting in paralysis of Mr. Parmelee from the nipples downward. He died nine days later on January 25, 1986.
Dr. Hemley testified she returned to the recovery room at 9:30 p.m. to check on Mr. Parmelee and to see whether he could move his arms and legs. His condition was the same as that prior to surgery. Her testimony was contradicted by two Ochsner nurses who testified she did not see Mr. Parmelee until 2:55 a.m. There is a notation in Mr. Parmelee's medical record by the nurses in the recovery room that he was experiencing a reduction in movement at approximately 8:10 p.m. Another nurse's notation at 11:15 p.m. by Nurse Reed stated: "Dr. Hemley aware of movements in left arm and left leg and right leg. No orders received."
Nurse Reed testified she notified Dr. Hemley at approximately 11:15 p.m. to indicate the reduction in movement. She stated Dr. Hemley told her the reduction was due to morphine. Dr. Hemley denied being told of a reduction in movement at that time. Instead, she stated the nurse told her Mr. Parmelee could lift his legs off the bed. She testified only being notified of a reduction at approximately 2:00 a.m. She stated she then called Dr. Kline because she could not take the patient back into the operating room by herself.
After the second surgery Mr. Parmelee was placed in a rotary bed to help alleviate breathing problems. He had sustained a previous partial loss of the use of his diaphragm from the boating accident.
Dr. Kline testified pulmonary physicians and pulmonary technicians were called to treat Mr. Parmelee's breathing difficulty.
*1014 Dr. Hemley left on January 24, 1986 to deliver her baby. Dr. Kline was in Lafayette, Louisiana on January 25, 1986 to deliver a paper. Mr. Parmelee's neighbors, Maria B. Tully and Kathy Tully, sat with him along with a private nurse. Mrs. Parmelee was ill with the flu and could not stay with her husband.
In the morning of January 25, 1986, the date of death, a bronchoscopy was performed in order to assist Mr. Parmelee's breathing.
Maria B. Tully testified she sat with Mr. Parmelee at the hospital the 23rd, the 24th, and the 25th. She asked the nurse to get Dr. Kline because of Mr. Parmelee's breathing difficulty and was told he was out of town and couldn't be reached. Dr. Kline never showed up while she was there. She left the hospital about 2:00 or 2:30 p.m. on the 25th. She did observe respiratory therapists come into the room and put a breathing machine on him. She knew that on the morning of the 25th a bronchoscopy was performed. On the 23rd she spoke to Dr. Haygood, a pulmonary doctor. She thought he was the physician who did the bronchoscopy. She also spoke to Dr. Graham on the 23rd who said he was one of Dr. Kline's assistants. She spoke to no doctors on the 24th. She spoke to no other doctors on the 25th other than Dr. Haygood.
Maria B. Tully's daughter, Kathy Tully, testified she started sitting for Mr. Parmelee the night of the 22nd. She was there on the 24th at night and remained until he died the night of the 25th. The bronchoscopy was done about 11:30 a.m. the 25th. At first his breathing improved following the procedure, then it worsened. She kept going to the nurses' station asking them to call Dr. Kline but nobody came.
Later, she left him briefly to change clothes and when she returned he was worse. She screamed and a "respiratory guy" came in and administered CPR. She was pulled out of the room. She was positive Dr. Kline never saw him on the 25th while she was there.
She stated there was an LPN in the room with her and respiratory therapists came in and out of the room. She stated, "[t]hey would come in like every three hours or so and they would give him a treatment; suction him, do CPC and then they would leave." Dr. Graham and Dr. Haygood also came into the room.
She testified no one was there on the afternoon of the 25th when he started having difficulty. Dr. Graham and Dr. Lowder were there at 3:00 p.m. when they put Mr. Parmelee back in his bed. From 3:00 p.m. on, no doctors came into the room until she screamed.
Dr. Kline stated he saw Mr. Parmelee around 6:00 p.m. on the 25th and that Mr. Parmelee informed him he could make it through the night. There is a notation in the chart by Nurse Albritton that Dr. Kline saw Mr. Parmelee around 6:00 p.m.
The defense called three experts. The three experts called by the defense were Dr. John Scharfenberg, Dr. Donald Richardson, and Dr. Thomas Ryan.
Dr. John Scharfenberg, an expert in anatomical and clinical pathology, testified he performed the autopsy on Mr. Parmelee at the request of Dr. Kline. He stated:
[t]he primary cause of death was collapse of each lung almost entirely. This was further complicated by fluid on the lungs and early signs of the infection of the bronchial tubes and infection of the lung tissue itself, pneumonia.
Dr. Scharfenberg also testified Mr. Parmelee had necrosis or cell death in the cervical spinal cord. The death of the spinal cord won't kill a person but the killing of the spinal cord caused the lungs to collapse. Dr. Scharfenberg clearly felt the cause of death on January 25, 1986 was the collapse of the lungs "with complications superimposed upon that in the form of pneumonia and bronchiolitis and edema or fluid in the lungs." A "very significant contributing cause" of death was the paralysis of the right diaphragm from the boating accident in 1981. The complications of the surgery were worsened by this preexisting condition. He stated such a patient needed special care and that the "vigorous respiratory therapy [u]ndertaken" noted in *1015 Mr. Parmelee's medical record complied with the special care needed.
Dr. Donald E. Richardson, an expert in neurosurgery, testified he reviewed the care and treatment given Mr. Parmelee by Dr. Kline. Although there had been an attempt at trial by plaintiffs' counsel to suggest negligence on Dr. Kline's signing orders after the orders had been given verbally, Dr. Richardson testified this practice is very common.
Additionally, plaintiffs' counsel attempted to show negligence on Dr. Kline's part by pointing to an "out of sequence" note from a nurse indicating Dr. Kline had visited with Mr. Parmelee prior to his death. Dr. Richardson stated it is standard protocol for a nurse to make such a notation. It means she was busy and did not have time to do it before then.
He specifically stated Dr. Kline did not breach any standards of care for neurosurgery. Dr. Kline is the "world's expert" on brachioplexus injuries and the "drez lesion" procedure on Mr. Parmelee is the "procedure of choice for brachioplexus evulsion pain."
A blood clot following a cervical spine operation causing paralysis is a known complication. Dr. Kline's opening up Mr. Parmelee at bedside in recovery without anesthesia was a proper thing to do. He explained:
it's better to open it up and take the chance of infection than have them, you know, they're going to die.
He stated a resident is someone with an M.D. degree and a medical license "who has already had an internship or a first year of training." Residents are not medical students. He knows people who practice neurosurgery who have had no formal training program, i.e. residency.
He stated a resident who was informed of no movement of the patient's legs or arms three hours after surgery would be remiss not to call the neurosurgeon under whom she is training. He felt "she needed to examine the patient herself." Time is of the essence. The proper medical standard is to evacuate the blood clot as quickly as possible. He stated:
[e]very first year resident knows if a patient is getting increasing neurological deficit, that something need [sic] to be done ... [i]f they don't do that, they are breaking my rules and Dr. Kline's rules or any other neurosurgeon. That is a basic tenet in neurosurgery ... that is something that you are told in the first two weeks of your training.
However, it is no breach of the standard of care on the part of the neurosurgeon if the resident fails to call him. All the neurosurgeon is required to do is to respond when he knows of a problem.
Pulmonary care and respiratory care are not within the specialty of neurosurgery. Respiratory or pulmonary difficulties encountered when a patient is paralyzed are difficult to treat. He, as a neurosurgeon, would feel "totally inadequate to take care of a pulmonary problem" in such a patient. He would call in a pulmonologist.
He noted Mr. Parmelee received "a lot of pulmonary care". He saw that consults were obtained. Orders were written for pulmonary care. In addition to a physician, respiratory therapy and physical therapy were ordered. Mr. Parmelee received this treatment. He stated Dr. Kline met all standards of care for neurosurgery. He met the standard by obtaining pulmonary consults and necessary therapy.
At Ochsner there are people other than nurses to care for patients when a doctor leaves town. From review of the record, he noted Mr. Parmelee was never without a physician who could be contacted at any time. On cross-examination he testified someone in the field of neurosurgery should be taking Dr. Kline's calls while he is out of town.
Dr. Kline testified that Dr. Lowder was a resident in neurosurgery. Dr. Lowder took Dr. Hemley's place when she left to have her baby. He called Dr. Lowder to take over Dr. Hemley's position.
Dr. Richardson stated that with regard to whether the pulmonary care given by pulmonologists at Ochsner met the standard of care, he would have to defer to the expertise of a pulmonologist.
*1016 Dr. Thomas B. Flynn, an expert in neurosurgery, testified he reviewed the care and treatment provided by Dr. Kline. He agreed it is routine for a physician to sign an order on a later date. An out of sequence note by a nurse means she was busy with other duties at the time. He saw no evidence the Ochsner record had been changed or altered.
He found no breach of the standard of care by Dr. Kline.
He stated there is no doubt "vigorous respiratory care" was given Mr. Parmelee. There is no indication in the medical record Mr. Parmelee was ever without adequate physician coverage even when Dr. Kline left town.
He read that approximately 5:00 p.m. and 5:30 p.m. on January 25th, the date of death, there were doctor's orders by Dr. Lowder. The types of orders given indicate Dr. Lowder had seen Mr. Parmelee close to the time of the orders.
He found no breach at any time by Dr. Kline of the standard of care.
He testified the standard of care would be for a physician to examine a patient with decreased movement after surgery. Time is important when dealing with a blood clot. If Dr. Kline had known Dr. Hemley did not respond before in a similar situation he should have fired her this time.
Dr. Kline was questioned about delay on the part of a physician who is notified of reduced movement after the type of surgery had by Mr. Parmelee. He stated, "we teach that if it's a suspected clot it should be taken care of as soon as possible." He also testified he teaches his students that if there is loss of movement after surgery to do something as soon as possible.
Dr. Kline explained he was involved in the selection process for Dr. Hemley. She was selected from 50 applicants. Dr. Hemley was approximately 38 years of age with a Ph.D. in neurophysiology. She had two years of general surgery training in New York.
The Parmelees allege two incidents of malpractice. They contend Dr. Hemley breached the standard of care by failing to act timely to prevent the necrosis of Mr. Parmelee's spinal cord and that Dr. Kline is liable for that damage as a result of the vicarious liability of a teacher for a student.
They further allege Dr. Kline breached the standard of care by leaving Mr. Parmelee to attend an out of town meeting knowing his patient was having breathing difficulty. At oral argument plaintiffs' counsel stated that despite defense's experts testifying Dr. Kline did not breach the standard of care by leaving town they also testified the treating physician must not leave the patient without coverage by a physician. This testimony, together with Kathy Tully's testimony that no physician saw Mr. Parmelee from 3:00 p.m. until a "code 2" had been called is what counsel relies on to show he met the burden of proving independent liability on Dr. Kline's part.

DR. SUSAN HEMELY:
The record is devoid of any evidence Dr. Kline was independently negligent for timely failure to respond. There is no evidence he was aware of reduced movement until approximately 2:30 a.m. When he became aware at that time he responded promptly.
Dr. Hemley was a first year resident in neurosurgery training at Ochsner. At the time of the incident she was not a board certified neurosurgeon. She was treating Mr. Parmelee under Dr. Kline's teaching supervision.
Since Dr. Hemley was limiting her practice of medicine to neurosurgery and was holding herself out as a specialist in that area she is classified as a specialist under La.R.S. 40:1299.39(A)(4) and 9:2794(A)(1). See also Williams v. Lallie Kemp Charity Hospital, 428 So.2d 1000 (La.App. 1st Cir.1983) writ denied, 434 So.2d 1093 (La.1983).
We have stated the standard for specialists as follows:
A medical specialist is required by LSA-C.C. arts. 2315 and 2316 and LSA-R.S. 9:2794 to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised and possessed *1017 by physicians within his medical speciality. Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978). Where the defendant practices a particular medical speciality the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians [w]ithin the involved medical speciality.
Plaintiff must also prove defendant either lacked this degree of skill or failed to use reasonable care and diligence along with his best judgment in the application of that skill and that as a proximate cause of this lack of knowledge or skill, or the failure to exercise this degree of care, the plaintiff suffered injuries that would not otherwise have been incurred. R.S. 9:2794.
Culver v. Ochsner Foundation Hosp., 474 So.2d 984, 987 (La.App. 5th Cir.1985), writ denied 477 So.2d 705 (La.1985).
The testimony at trial supports the jury finding Dr. Susan Hemley negligent. The jury evidently believed the testimony of the nurse who testified she had earlier notified Dr. Hemley and Dr. Hemley gave no orders. There is expert testimony that time is of the essence in a situation where a blood clot compresses the spinal cord. The autopsy revealed the cause of death to be a collapsing of the lungs due to the paralysis caused by necrosis of the spinal cord.
Since there is no evidence of a breach of the standard of care on the part of Dr. Kline, his liability, if any, would only stem from the vicarious liability for a teacher of a student imposed by La.Civ.Code art. 2320. Article 2320 provides in pertinent part:
Teachers and artisans are answerable for the damage caused by their scholars or apprentices, while under their superintendence.
In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it.
Appellant argues that even if Dr. Hemley were negligent, there is no evidence Dr. Kline "might have prevented the act which caused the damage." La.Code Civ. art. 2320. We agree.
Dr. Kline explained the highly competitive screening process of the resident program. There was no indication he participated in a faulty screening program and that Dr. Hemley lacked sufficient qualifications. Dr. Kline also testified he taught his students to respond quickly when there was decreased movement post-surgery.
There is expert testimony Dr. Kline did not breach the standard of care by leaving a resident, who was also a licensed medical doctor, in charge of his recovering patient. The uncontradicted testimony is that residents are taught the basic tenet Dr. Hemley violated.
Article 2320 by its specific terms does not impose absolute liability on a teacher. The jury therefore held Dr. Kline vicariously liable by imposing absolute liability since there is no evidence he "might have prevented the act which caused the damage." La.Civ.Code art. 2320.
Appellees cite the case of Carter v. Louisiana State University, 520 So.2d 383 (La. 1988) as a case in which a veterinary doctor in charge of treatment was held vicariously liable for negligent acts of his student. However, in that case the veterinarian teacher looked at and had the horse's tail rewrapped after he observed an ulceration. The too-tight wrapping of the tail of the horse by a student caused loss of blood and ultimate loss of the tail. The Louisiana Supreme Court quoted article 2320 as it applies to teachers and students. We interpret Carter as a case which does not impose absolute liability on the part of the supervising veterinarian since the veterinarian was aware of the ulceration. He was therefore in a position to prevent the act complained of.
In Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3rd Cir.1987), writ denied 522 So.2d 563 (La.1988) the Third Circuit considered a malpractice case involving a circumcision of a two-year old's penis. Two residents performed the surgery at a teaching hospital. One resident was a family practice resident and the other was a surgical *1018 resident. The surgical resident supervised the surgery. Both residents were under the medical school's chief of surgery's supervision. The medical school was sued but the chief of surgery was not. The allegation of negligence on the part of the school was based on failure to adequately train and supervise the surgical resident.
The surgical resident was a licensed physician. She was found negligent for modifying a procedure without consulting with her supervisor and in failing to explore the risks of that deviation in procedure. The deviation was the use of an electrosurgical unit in the circumcision of a penis which caused the loss of this appendage.
The medical school was found independently negligent for allowing a third year resident to perform elective surgery "without staff present in the operating room" in violation of its own rule. Id. at 929. The testimony established that the school rule for supervision was not followed for circumcisions. The Felice court stated at 929.
Under these facts we find that the medical school, as the agency having supervision over the surgeons, owed a duty to the patient [t]o have the elective surgery supervised by the medical school staff or a certified general surgeon. By having a policy of applying the regulation only to major surgeries the medical school breached its duty in the present case ... In the present case it is probable that if a certified general surgeon had supervised the surgery [h]e would not have allowed the residents to modify well-established techniques without first exploring the risks involved. Therefore, we find a causal connection between the failure of the medical school to supervise the surgery and the damages which resulted from the modification of well-established technique.
In the instant case the testimony was uncontradicted that there is no breach of the standard of care for a supervising surgeon to leave a resident in charge of recovery room care of a patient following surgery. There was no evidence of a violation of a school rule.
In Butler v. Louisiana State Board of Education, 331 So.2d 192 (La.App. 3rd Cir. 1976), writ refused 334 So.2d 230 (La.1976) the Third Circuit concluded a university biology professor was negligent in failing to give proper instructions to a student and in failing to provide proper facilities for that student's taking blood samples in a research project. The project was under the teacher's supervision. The court in that case did not have to consider the vicarious liability of a teacher for a student under La.Civ.Code Art. 2320 since the teacher was independently negligent.
There is uncontradicted testimony Dr. Kline taught his students the basic tenet Dr. Hemley violated. He is therefore not independently liable for failing to properly instruct.

CAPTAIN OF THE SHIP DOCTRINE:
A review of national jurisprudence reveals that:
A physician generally is not held liable for the acts or omissions of a hospital resident unless he is able to control the acts of that individual. 61 American Jurisprudence 2d (1981) 439 Physicians, Surgeons, and other healers, Section 289. See, also, Baird v. Sickler (1982), 69 Ohio St.2d. 652, 23 O.O.3d 532, 433 N.E.2d 593.
Traster v. Steinreich, 37 Ohio App.3d 99, 523 N.E.2d 861 (1987) 523 N.E.2d at 863.
In Traster, supra, the supervising physician was not present at the time the resident failed to intubate a patient with respiratory problems. There was no finding of negligence on the part of the supervisor.
The Supreme Court of Appeals of West Virginia has also followed the general rule that:
Where a defendant has control over the negligent actor, he may be vicariously liable for that actor's negligence. See generally, 5 F.Harper, F. James and O. Gray, The Law of Torts Section 26.1 (2d ed. 1986).
Thomas v. Raleigh General Hosp., 358 S.E.2d 222 (W.Va.1987) at 224.
*1019 The Thomas, court also noted the "captain of the ship doctrine" has been rejected by a "majority of states". The doctrine imposed liability on a surgeon by virtue of his status rather than on the basis of his control. Id.
The Thomas court traced the history of this concept at 224-225 and 224 n. 1:
In looking to the history of this doctrine, Pennsylvania originally adopted the captain of the ship doctrine to get around charitable immunity for hospitals:
... [I]f operating surgeons were not to be held liable for the negligent performance of the duties of those working under them, the law would fail in large measure to afford a means of redress for preventable injury sustained during the course of such operations.
[McConnell v. Williams ] 361 Pa. [355] at 364, 65 A.2d [243] at 247 [ (1949) ]. Most states have now abolished the hospital charitable immunity doctrine, as did West Virginia in syllabus point 1 of Adkins v. St. Francis Hosp., 149 W.Va. 705, 143 S.E.2d 154 (1965). The need for the doctrine gone, the majority of states which are now considering the captain of the ship doctrine are rejecting it. See, e.g., May v. Broun, 261 Or. 28, 37-38, 492 P.2d 776, 780-781 (1972); Sparger v. Worley Hosp., Inc., 547 S.W.2d 582, 584 (Tex.1977).1
We reject the captain of the ship doctrine. The trend toward specialization in medicine has created situations where surgeons do not always have the right to control all personnel within the operating room. See Thompson v. Lillehei, 164 F.Supp. 716, 721 (D.Minn.1958), aff'd., 273 F.2d 376 (8th Cir.1959). An assignment of liability based on a theory of actual control more realistically reflects the actual relationship which exists in a modern operating room. See May v. Broun, 261 Or. 28, 37-38, 492 P.2d 776, 781 (1972); see also Bria v. St. Joseph's Hosp., 153 Conn. 626, 629-630, 220 A.2d 29, 31 (1966). [footnote 2 omitted.]

Thomas, supra n. 1 at 224 states:
The court in Sparger noted that the "captain of the ship" doctrine had spread further than its drafters intended:
similes sometimes help to explain a factual situation, but in legal writing, phrases have a way of being canonized and of growing until they can stand and walk independently of the usual general rules. Mr. Justice Frankfurter once wrote concerning such phrasemaking in judicial opinions: "The phrase ... is an excellent illustration of the extent to which uncritical use of words bedevils law. A phrase begins life as a literary expression; its felicity leads to it as a legal formula, undiscriminatingly used to express different contradictory ideas." Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 68, 63 S.Ct. 444, 452, 87 L.Ed. 610 (1942). The result in the use of the captain of the ship is that a surgeon or physician may be held liable, not as others upon the basis of the general rule of borrowed servant, but as captain of the ship.
547 S.W.2d at 584.
While plaintiffs' counsel never directly referred to this doctrine he nonetheless focused questioning directed toward Dr. Kline's "responsibility" as treating physician for Mr. Parmelee's care. The testimony is uncontradicted and admitted to by defense experts that Dr. Kline was "responsible" for Mr. Parmelee's care. It is therefore possible the jury found Dr. Kline vicariously liable under a "responsibility" theory, i.e. "captain of the ship" doctrine.
In Baird v. Sickler, 69 Ohio St.2d 652, 433 N.E.2d 593 (1982) the Supreme Court of Ohio considered the issue of liability of a chief surgeon for a nurse-anesthetist assistant who was not employed by him. At issue was the vicarious liability of the chief surgeon for an anesthetist who negligently performed an intubation. The chief surgeon was found vicariously liable since he was present in the operating room and participated in the administration of the anesthetic.
In a case involving a lap sponge left in a person's body following surgery, the Louisiana *1020 Supreme Court stressed the importance of "immediate supervision and control" by the surgeon in order to impose vicarious liability on a "borrowed servant" theory in Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148, 154 (La.1969):
While the general rule that the surgeon is in charge of all personnel in the operating room during the performance of the operation, we do not feel that the evidence justifies the conclusion that, under modern medical operative procedures, it can be said that the borrowed servant doctrine applies in this case. For it is shown by the record that operations performed under modern techniques require team performance, and the nurses and other personnel assisting in the operating room are not at all times under the immediate supervision and control of the operating surgeon so as to bring the case strictly within the "borrowed servant" doctrine.
The Grant court, however, found independent liability on the part of the operating surgeon since he personally withdrew the sponges from the plaintiff's body and "had the obligation of ascertaining that each holder had a sponge attached." Id. 223 So.2d at 154. Both the nurses and the operating surgeon were found to be independently and concurrently negligent. Id. at 155.
The Grant rationale was applied by the Second Circuit in Parker v. St. Paul Fire & Marine Ins. Co., 335 So.2d 725 (La.App. 2nd Cir.1976), writ refused 338 So.2d 700 (La.1976).
In Parker a surgeon was not held to be vicariously liable for the negligence of nurses who failed to check the blood type of the plaintiff with units of blood used in a transfusion. The Parker court held at 734-35:
While [the surgeon] had the right to direct the nurses in attendance in the operating room, the nurses in checking the units of blood and in commencing the transfusion were not responding to the operating surgeon's exclusive control and were not under his immediate supervision and control in conducting that particular procedure.
The Parker court also noted the operating surgeon had no independent negligence since "[i]t was entirely proper for him to continue with the operation and for him to rely upon [t]he nurses [t]o check and be certain that the blood was of the proper type[.]" Id. at 734.
In Pierre v. Lallie Kemp Charity Hosp., 515 So.2d 614 (La.App. 1st Cir.1987), writ denied 515 So.2d 1111 (La.1987) the Third Circuit considered the vicarious liability of surgeons for the negligence of a nurse-anesthetist during the operation. The court did not find vicarious liability since the nurse-anesthetist was not under the control of the surgeons.
Similarly, a treating physician was not held vicariously liable under the "captain of the ship doctrine" for the negligence of a nurse-anesthetist in Hughes v. St. Paul Fire & Marine Ins. Co., 401 So.2d 448 (La.App. 1st Cir.1981). In Hughes, the treating physician ordered nasal intubation which was negligently performed by the nurse-anesthetist. Since he neither supervised nor controlled that party's acts he was not liable under this doctrine.
In summary, the Louisiana jurisprudence has not favored the imposition of absolute liability for a surgeon who directs and controls the acts of others absent "immediate supervision and control." Grant, supra. Similarly, a supervising physician should not be held absolutely liable for the acts of negligence of a resident absent a finding that "he might have prevented the act which caused the damage, and have not done it." La.Civ.Code Art. 2320.

MANIFEST ERROR:
In Rosell v. Esco, 549 So.2d 840 (La.1989) the Louisiana Supreme Court explained at 844:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of *1021 credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978) [remaining citations omitted].
However, the Rosell court further stated at 844, n. 2:
The Louisiana Constitution provides that the appellate jurisdiction of a court of appeal extends to law and facts. La. Const.1974, Art. V Sec. 10(B). This provision, resulting from Louisiana's history as a civilian jurisdiction, has been interpreted as giving an appellate court the power to decide factual issues de novo. The exercise of this power is limited, however, by the jurisprudential rule of practice that a trial court's factual finding will not be upset unless it is manifestly erroneous or clearly wrong. Nevertheless, when the court of appeal finds that a reversible error of material fact was made in the trial court, it is required to redetermine the facts de novo from the entire record and render a judgment on the merits. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). See also, McLean v. Hunter, 495 So.2d 1298 (La.1986); Otto v. State Farm Mut. Ins. Co., 455 So.2d 1175 (La.1984); Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980). [emphasis added].
In Ragas, infra, the Louisiana Supreme Court explained at 708:
The manifest error rule is the standard by which the fact-finding function of the trial court is measured. It assumes legal issues were correctly decided.
* * * * * *
Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law forecloses any finding of fact, and where the record is otherwise complete, the appellate court should, if it can, render judgment on the record.
In Arceneaux, infra, the Louisiana Supreme Court explained at 1334:
If the Court of Appeal should decide, on an appeal of right from the district court, only that there is some evidence to support the judgment, without determining whether the district court judgment is clearly wrong considering all the evidence, the Louisiana system of review breaks down. The losing litigant may never obtain actual review of the district court judgment, if the issue is factual.
In applying the above standards enunciated by the Louisiana Supreme Court we find reversible error as a matter of law for the reasons stated. Furthermore, our independent review of the record reveals there is no evidence to find Dr. Kline independently or vicariously liable for the lack of timely intervention by Dr. Hemley.

LACK OF ATTENDANCE PRECEDING DEATH:
Plaintiffs/appellees argue Dr. Kline was guilty of malpractice for leaving town to deliver a paper while Mr. Parmelee was having breathing problems.
The jury evidently believed Kathy Tully's testimony that she told the nurses to call Dr. Kline and that no doctor came the 25th from 3:00 p.m. until she screamed. Although Dr. Kline testified he did visit Mr. Parmelee prior to his death, the jury gave greater weight to Kathy Tully's testimony.
Even accepting the finding of fact by the jury that Dr. Kline did not appear prior to Mr. Parmelee's death, the testimony is uncontradicted that Dr. Kline fulfilled the proper standard of care by having physician coverage. Dr. Kline also testified that when Dr. Hemley left to have her baby he replaced her with another resident, Dr. Lowder. Plaintiffs' witnesses, Maria Tully and Kathy Tully, admitted seeing a pulmonary physician who performed a bronchoscopy the morning of the death. Kathy Tully admitted seeing Dr. Lowder along with Dr. Graham at 3:00 p.m. the date of death.
Plaintiffs/appellees sued Ochsner as well. The jury evidently found Ochsner to be 10% negligent for failing to contact a physician when asked by Kathy Tully to call Dr. Kline. There is no evidence Dr. Kline was vicariously liable for the actions or non-actions of the nurses or that he was *1022 contacted and did not respond. There is also no evidence that Dr. Lowder, another L.S.U. resident, was contacted and did not respond.
In Royer v. St. Paul Fire & Marine Ins. Co., 502 So.2d 232 (La.App. 3rd Cir.1987), writ denied 503 So.2d 496 (La.1987), the third circuit concluded that "two physicians [who] practiced different types of medicine completely independent of each other were not vicariously liable for each other's alleged negligence." Id. at 237.
Similarly, the Fourth Circuit did not hold a treating physician liable for the acts of a second physician who was called by him to cover his patient during his vacation. Moran v. Dean, 416 So.2d 351 (La.App. 4th Cir.1982). Although the treating physician was found "remiss in failing to notify his patient of his anticipated absence and providing his replacement with plaintiff's medical history to assist in the treatment" there was no causal relation between these acts and the "plaintiff's treatment or the infant's death." Id. at 354. The court found the actions of the substitute physician to be a breach of the standard of care and "causally connected" to the injuries complained of. Id. at 356.
In the instant case Kathy Tully testified Dr. Kline did not come to the room despite her repeatedly asking nurses to contact him. The implication to the jury is that Dr. Kline breached the standard of care by failing to be physically present during those hours prior to Mr. Parmelee's death. Defense experts testified there was no breach of the standard of care by Dr. Kline's leaving town to give a paper; that he met the standard by having physician coverage. Both Kathy Tully and her mother admitted to the presence of a pulmonary doctor who performed a bronchoscopy the morning of the date of Mr. Parmelee's death.
We conclude the jury erred as a matter of law in finding Dr. Kline vicariously liable for the inactions of the nurses approached by Kathy Tully and for finding him vicariously liable for the acts or failure to act on the part of independent pulmonary physicians whom he brought in for consults. We are not persuaded by counsel's argument Dr. Kline is independently negligent based on his failure to be present during the afternoon of the death. We do not interpret the Louisiana jurisprudence cited herein as imposing absolute liability on the part of a neurosurgeon who calls in a pulmonary specialist to treat his patient's breathing problems. See Royer, supra.
For the reasons stated we set aside the judgment of the trial court. The jury verdict is reversed insofar as Dr. David G. Kline and we now render judgment in favor of Dr. David G. Kline dismissing plaintiffs' claims against him with prejudice. We revise the jury's allocation of fault in accordance with the dismissal of Dr. David G. Kline and now attribute 90% of the negligence to Dr. Susan Hemley. We leave intact the 10% negligence attributed to Ochsner Foundation Hospital. We also leave intact the jury award of $750,000.00 in damages along with its apportionment by the jury. The jury apportionment of $225,000.00 to Rose Parmelee, $100,000.00 to Jill Parmelee, $100,000.00 to Chris Parmelee, and $325,000.00 to the estate of Richard C. Parmelee is affirmed and final. Since neither Ochsner nor Dr. Hemley have appealed the judgment of liability or the damage award of $750,000.00 that judgment is final as to them. Piper v. Central Louisiana Elec. Co., 542 So.2d 7, writ denied 544 So.2d 409 (La.1989).

PATIENT'S COMPENSATION FUND:
In plaintiffs' consolidated action against the Fund they seek damages in excess of the $100,000.00 paid by Ochsner on its behalf and on behalf of Dr. Hemley. The Louisiana Supreme Court has recently held:
We conclude that payment of $100,000 to a medical malpractice victim by one qualified health care provider (or the provider's insurer) triggers the admission of the liability provision of La.Rev.Stat. Ann. 40:1299.44C(5), and the only contested issue remaining thereafter between the victim and the fund is the amount of the victim's damages in excess of the amount already paid.
Stuka v. Fleming, 561 So.2d 1371 (La.1990) at 1371.
*1023 The Fund did not intervene in plaintiffs' malpractice suit and is not a party to this appeal. The Supreme Court explained the status of the Fund in Stuka, supra, as follows:
The status of the Fund, after a settlement between the malpractice victim and a health care provider for $100,000, is more in the nature of a statutory intervenor than a party defendant. As an intervenor the Fund may put on evidence and unite with the defendant in resisting the victim's demands, and may appeal a judgment, but may not object to the form of the action. Williams v. Kushner, 449 So.2d [455] at 458 [ (La.1984) ]. Moreover, when a judgment in excess of $100,000 has been rendered in a suit between the malpractice victim and the health care provider, the Fund may appeal the excess judgment against the Fund. Felix v. St. Paul Fire and Marine Insurance Co., 477 So.2d 676 (La. 1985).
Id. at 1374.
Additionally, Ochsner and Dr. Hemley have not appealed the damage award of $750,000.00 by the jury. That damage award along with its apportionment by the jury is now a final judgment. Piper, supra.
We have reversed the jury finding of negligence on Dr. Kline's part and have revised the finding of negligence on the part of Dr. Hemley to 90% while leaving intact the 10% finding of negligence on the part of Ochsner.
The consolidated case of 90-CA-601, "Rose B. Parmelee, wife of/and as Administratrix of the estate of her daughter, Jill E. Parmelee, daughter of/and Chris A. Parmelee, daughter of the deceased, individually and on behalf of the deceased, Richard C. Parmelee v. Patient's Compensation Fund" is hereby remanded to the trial court for proceedings consistent with the views expressed herein. We further note a plea of unconstitutionality has been raised in that action and has not yet been addressed by the trial court.
TRIAL COURT JUDGMENT SET ASIDE; JURY VERDICT REVERSED IN PART, REVISED IN PART AND AFFIRMED IN PART; JUDGMENT RENDERED; CONSOLIDATED CASE NO. 90-CA-601 REMANDED.